RONALD A. GOFF, Plaintiff-Appellant, v. TEACHERS' RETIREMENT SYSTEM OF THE STATE OF ILLINOIS *et al.*, Defendants-Appellees.

Fifth District    No. 5—97—0946

Opinion filed June 8, 1999.

J. William Lucco and Billie L. Johnson, both of Lucco, Brown & Mudge Law Offices, of Edwardsville, for appellant.

Ralph H. Loewenstein, of Loewenstein, Hagen, Oehlert & Smith, P.C., of Springfield, for appellees.

JUSTICE MAAG delivered the opinion of the court:

Plaintiff, Ronald A. Goff, began his career as a teacher in 1964 and has been a member of the defendant, the Illinois Teachers' Retirement System (Retirement System), since that time. When Goff retired, he was the principal at Edwardsville Junior High School (Junior High). Goff retired from this position in 1993 and began drawing pension benefits from the Retirement System in the amount of $3,300 per month. Goff testified that he actually received approximately $2,800 per month due to his paying the employee's contribution for the early retirement incentive program.

Goff pleaded guilty in October and November of 1995 to six separate counts of aggravated criminal sexual abuse for molesting two boys, D.L. and J.L. The Retirement System was notified that Goff had pleaded guilty to six counts of aggravated criminal sexual abuse, a Class 2 felony. Thomas S. Gray, assistant general counsel for the Retirement System, investigated the matter and determined that the felonies were connected with, related to, and arose out of the plaintiff's service as principal at the Junior High. Gray notified Goff on November 8, 1995, that his pension with the Retirement System was revoked pursuant to section 16—199 of the Illinois Pension Code (40 ILCS 5/16—199 (West 1994)).

On November 28, 1995, Goff filed a complaint for declaratory relief in the circuit court of Madison County, challenging the revocation of his pension. Goff filed a motion for summary judgment on August 15, 1997. The Retirement System filed a motion for summary judgment on September 2, 1997.

A hearing was held on the motions for summary judgment, and on September 30, 1997, the circuit court issued its decision granting the Retirement System's motion for summary judgment and denying Goff's motion for summary judgment. The court stated as follows:

"This Court does find there is [sic] sufficient undisputed material facts to enter a Declaratory Judgment in this case. This Court finds that Plaintiff's illegal conduct which gave rise to his felony convictions in Madison County, Illinois, and Washington County, Illinois, are not separate and distinct acts separated from his role as a teacher/administrator. *** [T]o the contrary, the record as a whole shows a continuing series of activity [sic] in furtherance of scheming, planning, and carrying out his illegal activities which resulted in Plaintiff's felony convictions. This Court further finds that such scheming, planning[,] and carrying out of these illegal activities was [sic] related to and arising [sic] out of his service as a teacher which resulted in Plaintiff's felony convictions."

Goff filed a notice of appeal on October 27, 1997.

Goff claims on appeal that the Retirement System improperly revoked his pension pursuant to section 16—199 of the Illinois Pension Code.

■ Initially, we note that the proper standard of review for the entry of summary judgment is *de novo*. See *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 390, 620 N.E.2d 1073, 1077 (1993). Although we recognize that summary judgment is a drastic means of disposing of litigation, it is an appropriate measure in cases where there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. See *Crum & Forster Managers Corp.*, 156 Ill. 2d at 390-91, 620 N.E.2d at 1077.

■ A fundamental purpose of statutory construction is to ascertain and give effect to the intention of the legislature. See *In re Application of the County Collector of Du Page County for Judgment for Delinquent Taxes for the Year 1992*, 181 Ill. 2d 237, 244, 692 N.E.2d 264, 267 (1998) (*In re Du Page County Collector*). The best indicator of legislative intent is the actual language used by the legislature, which must be given its plain and ordinary meaning. See *In re Du Page County Collector*, 181 Ill. 2d at 244, 692 N.E.2d at 267; *Paris v. Feder*, 179 Ill. 2d 173, 177, 688 N.E.2d 137, 139 (1997). Additionally, courts should not depart from the plain meaning of a statute by reading into

it exceptions, limitations, or conditions that conflict with the express legislative intent. See *In re Chicago Flood Litigation*, 176 Ill. 2d 179, 193, 680 N.E.2d 265, 272 (1997). When the language of the statute is clear and unambiguous, courts must enforce the statute as written and may not resort to other aids for construction. See *Superior Structures Co. v. City of Sesser*, 292 Ill. App. 3d 848, 851, 686 N.E.2d 710, 712 (1997).

■ Section 16—199 of the Illinois Pension Code states, in relevant part, as follows:

"None of the benefits provided for in this Article shall be paid to any person who is convicted of any felony relating to or arising out of or in connection with his or her service as a teacher." 40 ILCS 5/16—199 (West 1994).

Goff argues that since the felonies for which he was convicted did not occur on school property or during school time, those felonies did not meet the statutory standard of "relating to or arising out of or in connection with his *** *service as a teacher*" (emphasis added) (40 ILCS 5/16—199 (West 1994)) in accordance with the language contained within the Illinois Pension Code. Goff claims that since the abuse occurred while he was in volunteer service as a church camp counselor and Boy Scout leader, his pension cannot be revoked in accordance with section 16—199 of the Illinois Pension Code. We disagree.

## I. FACTS

A review of the record in this case shows that Goff used his "service as a teacher" to take advantage of both of the children that he sexually abused. Goff used his "service as a teacher" to apply for the scoutmaster position by listing on the application form the fact that he was the principal of the Junior High. Goff understood that boys in his scout troop would often later become students at the Junior High. Goff introduced himself to the Boy Scout troop as the principal of the Junior High and would often refer to his position as principal when discussing various school activities with the boys. D.L. met Goff during his sixth-grade year, when Goff was his scoutmaster. The year after D.L. joined Boy Scouts, he began attending the Junior High. It was not until D.L.'s seventh-grade year that Goff began to sexually abuse him. Although the abuse occurred off of school property, Goff apparently intensified his efforts with D.L. at school by positioning himself in the hallway between classes so that he could see D.L. and have the opportunity to talk to him. While D.L. was at the Junior High, Goff would talk to D.L. about activities involving the Boy Scouts and church camp. Goff did not do this with other students. D.L. joined the wrestling team at the Junior High, and Goff, in his capacity as the

Junior High's principal, made a point to attend the home wrestling matches in which D.L. was a participant. On one occasion, Goff even had D.L.'s mother come to his office at the Junior High to make arrangements for a weekend when Goff could take D.L. to a horse camp.

As we previously stated, the sexual abuse of D.L. did not occur until D.L. was a student at the Junior High. D.L.'s mother had indoctrinated him since he was very young to respect and obey the principal and teachers. D.L.'s mother allowed him to spend so much time with Goff because of his position as the principal of the Junior High. She believed that since he was in such a position, he would be a "safe" person for her son to be with. D.L. stated that he was induced to engage in the sexual contact with Goff, in part, because of Goff's position as the principal of his Junior High and based upon the "esteem and authority" that his position impressed upon him as a young child.

Goff met J.L., his other victim, when he was serving as a church camp counselor. Goff listed on his church camp application that he was a school principal. Goff admitted that some of the boys that attended church camp would eventually end up being students at the Junior High. When J.L.'s parents dropped him off at church camp for the first time, Goff introduced himself as the principal of the Junior High. Since J.L.'s parents are both professional educators, they were impressed by the fact that Goff was a principal. Since Goff was a principal, J.L.'s parents were "confident that *** [J.L.] would be in good hands in his presence."

J.L. stated that Goff introduced himself as the principal of the Junior High and that Goff would often talk at camp about his school experiences. During Goff's cultivation of J.L. and his parents, Goff began socializing with J.L.'s parents at their home as well as his. During most of these occasions, Goff would spend a great deal of his time discussing his experiences at school and as an educator. On one occasion, he invited J.L.'s parents to come to the Junior High. Goff gave them a tour of the school, showed them his office, and introduced them to his secretary. Goff also took J.L. to the Junior High and gave him a tour of the school. Goff invited J.L. to a Junior High dance that he was chaperoning in his role as principal. After the dance, Goff took J.L. to his home to spend the night. Goff frequently attended events at J.L.'s schools and would make a point to introduce himself to J.L.'s principal and teachers and inform them that he was the principal at the Junior High.

Since J.L. was spending a lot of time with Goff, his parents tried to "check him out." They made inquiries about Goff with people who were either parents or teachers employed in the Edwardsville school

district. The reports that they received from these people were all positive. J.L.'s parents had also taught him to respect and obey the principal. J.L. stated that he was induced to engage in these activities in part because of Goff's status as a principal.

## II. ANALYSIS

■ No case has interpreted the precise language used in the statute (40 ILCS 5/16—199 (West 1994)); hence, this is a case of first impression. Goff is attempting to elude the provisions of this statute by claiming that the felonies to which he pleaded guilty were not connected with, were not related to, and did not arise out of his "service" as a teacher. Goff would have this court believe that his pension can only be revoked if the felonies actually took place on school time or school grounds or during an extracurricular activity for which Goff was serving as a school chaperon. Such a construction is far too narrow. Courts often employ terms such as "incidental to" or "connected with" when defining the phrase "arising out of." *Lynch Special Services v. Industrial Comm'n*, 76 Ill. 2d 81, 86, 389 N.E.2d 1146 (1979). The statutory phrases "relating to," "arising out of," and "in connection with" are very broad terms. "[A]n injury can be said to arise out of one's employment if its origin is in *some way* connected with the employment so that there is a causal connection between the employment and the *** injury." (Emphasis added.) *Consolidated R. Corp. v. Liberty Mutual Insurance Co.*, 92 Ill. App. 3d 1066, 1068-69, 416 N.E.2d 758 (1981). Applying these standards, we believe that the record amply supports the conclusion that the abuse in question was related to, arose out of, and was connected with Goff's service as a principal.

The record reveals that Goff's behavior with respect to the victims was predatory. He used his "service as a teacher" to exert influence over the victims as well as their parents. It is clear that Goff attempted to and actually did impress the parents of the victims with the fact that he was the principal of the Junior High. This induced the parents to trust Goff. He was allowed to take the children to various places, and the children were allowed to spend the night at Goff's residence. Goff used his "service as a teacher" to apply for and receive the position of scoutmaster and church camp counselor, which, in turn, enabled Goff to commit the crimes that he eventually pleaded guilty to.

Goff was the proverbial wolf in sheep's clothing. But he got caught! He will not be allowed to escape the sanctions imposed by law. The legislative mandate is clear. Educators who use their position of trust

to molest the children entrusted to them shall forfeit their pensions if convicted of a felony in connection therewith. About this there should be no mistake.

Goff took advantage of the victims as well as their parents and used and abused his "service as a teacher" to perpetrate the felonies that he eventually pleaded guilty to. Goff's "service as a teacher" was merely one of many tools that he used to sexually abuse his victims. It is of no consequence that the felonies for which Goff was convicted were connected both to his "service as a teacher" and to other endeavors. It is clear that Goff's "service as a teacher" enabled him to commit the felonies that he eventually pleaded guilty to.

We also note that Goff argued that the trial court committed reversible error by considering the fact that he sexually abused J.L. on a school trip to Washington, D.C., and Williamsburg, even though he did not plead guilty to those crimes. It is clear when reviewing the record that the trial court recognized that Goff did not plead guilty to committing crimes in either of those locations. The trial court did state that Goff "used his service as a teacher/administrator during \*\*\* [the] school trip to further his illegal activity which resulted in his felony convictions." A review of the record shows, however, that no abuse of either victim occurred after the school trip. Goff claims that when the findings of a trial court are against the manifest weight of the evidence, it is the duty of the reviewing court to reverse. See *Cornstubble v. Ford Motor Co.*, 178 Ill. App. 3d 20, 24, 532 N.E.2d 884, 886 (1988). While this is generally true, an error by itself does not warrant a reversal, and a court of review will only vacate a judgment if an "error occurred which prejudiced the appellant or unduly affected the outcome." *Cox v. Doctor's Associates, Inc.*, 245 Ill. App. 3d 186, 207, 613 N.E.2d 1306, 1320 (1993). Additionally, if the trial court's decision is correct on the merits, it will not be reversed even if the trial court used an incorrect means to reach the decision, particularly if a retrial would result in the same disposition. See *In re Marriage of Benefield*, 131 Ill. App. 3d 648, 650, 476 N.E.2d 7, 9 (1985).

In light of the foregoing analysis, it is clear that even without the remarks regarding the school trip, the trial court could have found, as we have, that Goff's felonies were connected with his "service as a teacher."

Since the record clearly shows that Goff's scheming, planning, and carrying out of the felonies that he pleaded guilty to were related to and connected with his "service as a teacher," Goff's pension was

properly revoked. Hence, we affirm the circuit court's decision granting summary judgment in favor of the Retirement System.

Affirmed.

KUEHN and HOPKINS, JJ., concur.