FIFTH DIVISION
June 30, 2006

No. 1-03-1589

DEAN R. BAUER,                                      )

                                            )

      Plaintiff-Appellee,              )     Appeal from the

                                            )     Circuit Court of

    v.                                )     Cook County

                                            )

STATE EMPLOYEES' RETIREMENT SYSTEM OF      )

ILLINOIS, BOARD OF TRUSTEES OF THE STATE      )

EMPLOYEES' RETIREMENT SYSTEM OF ILLINOIS,   )     Honorable

and MICHAEL L. MORY, Executive Secretary of the State  )     Julia M. Nowicki,

Employees' Retirement System,                )     Judge Presiding.

                                            )

      Defendants-Appellants.           )

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Dean Bauer, former Inspector General of the Illinois Secretary of State's office (SOS or Secretary's office or office of the Secretary of State), pleaded guilty to one count of obstruction of justice – tampering with a witness, a federal felony, in conjunction with a federal investigation into the licensing process at the Secretary's office known as "Operation Safe Road." 18 U.S.C. §§ 1512(b)(2)(B), 2 (2000)). In the instant case, the issue is whether Bauer's conviction for obstructing the federal investigation into corruption in the office of the Secretary of State was a "felony relating to or arising out of or in connection with his service" as Inspector General for the Secretary of State and, thus, required forfeiture of his retirement benefits under section 14-149 of the Illinois Pension Code. 40 ILCS 5/14-149 (West 2002). In resolving this issue, we are not required to decide whether Bauer properly investigated corruption in the Secretary's office while he served as Inspector General.

In his plea of guilty, Bauer admitted that he attempted to persuade Janet Carlson, his former

secretary from the Secretary of State's office, to destroy and conceal documents subpoenaed by a grand jury during the federal investigation into corruption in the licensing process at the Secretary of State's office, so the documents "would not be available to the grand jury." Upon retirement Bauer received a monthly pension of $991.32 based on eight years of service to the State of Illinois. Following Bauer's conviction, the Board of Trustees of the State Employees' Retirement System of Illinois (Board) terminated his retirement and health benefits because he had been convicted of a felony "relating to or arising out of or in connection with his service as an employee" under section 14-149 of the Illinois Pension Code (Code). 40 ILCS 5/14-149 (West 2002). Bauer filed a complaint for administrative review against defendants the Board, the State Employees' Retirement System of Illinois (SERS), and Michael L. Mory, executive secretary of SERS, challenging the decision to terminate his benefits. The trial court reversed the Board's decision, and defendants appeal.

BACKGROUND

Bauer served as Inspector General for the Secretary's office from January 1992 to January 1999. The Department of the Inspector General (IG Department) was required to perform certain functions for the SOS, including investigation of allegations of wrongdoing by SOS personnel. The IG Department was authorized to refer matters to a state or federal prosecuting authority for further investigation and possible prosecution if an investigation indicated an SOS employee had engaged in criminal conduct.

During the spring of 1994, while Bauer was Inspector General, the IG Department was investigating SOS employee Marion Seibel, from the McCook licensing facility, for fraudulently selling commercial driver's licenses. Bauer was aware of this investigation. In November 1994, a truck driven by Ricardo Guzman was involved in a fatal accident in Wisconsin killing six children

2

from the Willis family. IG Agent Russell Sonneveld undertook a preliminary investigation, which revealed Guzman had obtained his commercial driver's license at the McCook facility where Seibel was working. On November 15, 1994, Sonneveld told Bauer the results of his preliminary investigation and requested approval from Bauer to open a formal investigation into the Guzman incident and travel to Wisconsin to consult with authorities. Bauer instructed Sonneveld not to open an investigation but, rather, to let the Wisconsin authorities investigate.

The same day Bauer instructed Sonneveld not to open an investigation into the Guzman incident, Bauer called Willie Thompson, chief deputy director of the SOS Department of Police. During that conversation, Bauer told Thompson that: (1) Bauer was "actively pursuing" a case regarding the Guzman incident; (2) SOS officials should immediately forward any information or inquiries regarding the Guzman incident directly to Bauer; (3) there was a strong possibility that Guzman obtained his license illegally; and (4) SOS officials should keep the Guzman incident as confidential as possible.

On November 16, 1994, the day after Bauer called Thompson regarding Guzman, Thompson sent a memo to his superior, Jack Peccararo, the Director of the SOS Department of Police. The memo outlined what Bauer told Thompson during their conversation, including Bauer's comments regarding the IG Department's "active" investigation of the Guzman incident. Thompson copied Bauer on this memo. The Thompson memo would later become part of the subject matter of Bauer's federal guilty plea to obstruction of justice, in that the memo was one of the documents Bauer attempted to have his former secretary Janet Carlson conceal or destroy.

During the spring of 1998, federal investigators began "Operation Safe Road," an investigation into corruption in the licensing process at the Secretary's office. At the point in time when this investigation began, Bauer was serving as Inspector General for the Secretary's office.

Regarding that investigation, a federal grand jury issued a subpoena to the custodian of records at the IG Department. The subpoena sought case files and documents relating to the IG Department's investigation into the illegal issuance of commercial driver's licenses at various SOS facilities. The record custodian consulted Bauer, who was still serving as Inspector General, regarding the requested documents. In November 1998, the custodian produced documents for the grand jury in response to the subpoena.

On October 7, 1999, approximately nine months after Bauer left his position as Inspector General and while he was working for the Department of Transportation, Bauer spoke by telephone with his former secretary, SOS employee Janet Carlson. Unknown to Bauer, Carlson was cooperating with federal prosecutors from Operation Safe Road regarding the driver's license scandal at the SOS, and the conversation was being recorded. In February 2000, federal prosecutors filed a six-count indictment against Bauer in federal district court resulting from the Operation Safe Road investigation of corruption in the Secretary's office. The indictment included a count for obstruction of justice-tampering with a witness based on the telephone conversation between Carlson and Bauer. In April 2001, Bauer pleaded guilty to only the count of obstruction of justice based upon the October 7, 1999, telephone conversation he had with his former secretary, Carlson. In exchange for Bauer's plea of guilty, the remaining counts of the indictment were dismissed.

Bauer admitted in his plea of guilty that Carlson told him during the telephone conversation that she had come across "sensitive documents." According to Bauer's plea of guilty, the documents Bauer and Carlson discussed were responsive to the 1998 federal grand jury subpoena and "included, among others, a Bauer-related memo referring to the Guzman investigation and the likelihood that Guzman obtained his license fraudulently at the McCook facility." Carlson informed Bauer that Bauer had been copied on the memo and told him the memo caught her attention because

4

of "stuff in the newspapers." Bauer further admitted in his plea of guilty that after Carlson asked him what to do with the documents, Bauer suggested to her that she dispose of the documents, "intending by that suggestion to corruptly persuade [Carlson] to destroy or otherwise conceal the documents the best she could so that they would not be available to the grand jury."

On April 27, 2001, pursuant to the plea agreement, the federal district court entered a judgment of conviction against Bauer for obstruction of justice.

After Bauer's plea of guilty, the State Employees' Retirement System of Illinois (SERS) notified Bauer that as a result of his felony conviction his retirement and health insurance benefits would be terminated. The SERS Executive Committee conducted a hearing at which Bauer submitted a position statement, exhibits, stipulations to testimony, and the argument of his counsel. The Executive Committee neither requested nor called any witnesses. In January 2002, after the hearing, the Executive Committee issued a "Recommendation" concluding that Bauer was convicted of a felony relating to or arising out of or in connection with his service as a state employee and that his pension benefits should thus be forfeited pursuant to section 14-149 of the Illinois Pension Code, except to the extent that his retirement and health insurance benefits should be extended through January 31, 2002.

In its recommendation, the Executive Committee noted that counsel for Bauer contended during the hearing that section 14-149 of the Code did not apply to Bauer's case because the obstruction of justice was committed by Bauer on October 7, 1999, nine months after he left his position as Inspector General. The Executive Committee rejected this argument, concluding that the fact that Bauer did not obstruct justice until after he left the office of the Secretary of State "does not mean that it was not connected to his employment. To the contrary, the conduct for which he was convicted was directly and inherently related to his actions while in State service." In support of this

5

1-03-1589

conclusion, the Executive Committee placed Bauer's obstruction of justice felony in context as follows:

> "Mr. Bauer pled guilty to a felony alleging that he encouraged the disposal or destruction of certain documentation related to an ongoing investigation by the federal government. That documentation and evidence dealt with facts and circumstances which occurred while Mr. Bauer was employed as the Inspector General for the Secretary of State's Office.
>
> *** the Plea Agreement clearly show[s] that there was a memorandum created while [Bauer] was the Inspector General of the Office of the Secretary of State. This memorandum dealt with the Ricardo Guzman incident and was one of the documents which Mr. Bauer suggested be disposed of. ***
>
> * * *
>
> *** [T]he actions of [Bauer] were clearly related to documents and evidence dealing with his service as the Inspector General of the Office of the Secretary of State. The felony conviction of Mr. Bauer related to his efforts to obstruct justice by having evidence and documentation developed during his service as the Inspector General of the State of Illinois disposed of in order to protect parties."

On January 22, 2002, the Board of Trustees of the State Employees' Retirement System of Illinois adopted the Executive Committee's recommendation to terminate Bauer's pension and health

benefits under section 14-149 of the Code. On January 31, 2002, Bauer filed his complaint for administrative review seeking reversal of the Board's decision by the circuit court.

On May 5, 2003, the circuit court concluded the de novo standard was the appropriate standard of review for the interpretation of section 14-149 of the Code and reversed the Board's decision. In support of its reversal of the Board's termination of pension benefits, the court stated in relevant part:

> "The SERS' broad interpretation of the statutory language remains unsupported and contrary to the legislative intent even if the question at issue was considered to be one of mixed law and fact, thereby necessitating application of the clearly erroneous standard. City of Belvidere [v. Illinois State Labor Relations Board], 181 Ill. 2d [191,] 204 [(1998)]. Bauer's felony conviction, although arguably related to his former position as Inspector General, did not occur 'with his service as an employee,' but occurred nine months after he retired from employment with the state. Again, as a former employee, Bauer was no longer serving the public as a government employee and no longer held a position of trust with the state when he engaged in the felonious conduct. Under either standard, this case raises the question of what amount of time after termination of state employment can the pension board reach out to revoke benefits. Here, this Court finds the termination date could arguably provide a bright line test. However, certainly felonious conduct occurring nine months after termination from state employment is far beyond that

line.  As such, this Court reverses the decision of SERS revoking

Bauer's retirement benefits."

ANALYSIS

Under the Administrative Review Law (735 ILCS 5/3-101 et seq. (West 2002)), we review the Board's decision rather than the trial court's decision.  Calabrese v. Chicago Park District, 294 Ill. App. 3d 1055, 1065 (1998).  The issue before us is whether Bauer's conviction for obstructing the federal investigation into corruption in the office of the Secretary of State was a "felony relating to or arising out of or in connection with his service" as Inspector General for the Secretary of State and, thus, required forfeiture of his retirement benefits under section 14-149 of the Illinois Pension Code.  40 ILCS 5/14-149 (West 2002).  Interpretation of a statute is a question of law, and we agree with Bauer that we review the Board's decision under the de novo standard.  Shields v. Judges' Retirement System, 204 Ill. 2d 488, 492 (2003).

"Statutory construction requires courts to ascertain and give effect to the intent of the legislature."  Shields, 204 Ill. 2d at 493.  "In determining the intent of the legislature, we begin with the language of the statute, the most reliable indicator of the legislature's objectives in enacting a particular law."  Michigan Avenue National Bank v. County of Cook, 191 Ill. 2d 493, 504 (2000).  "Where the language of a statute is clear and unambiguous, a court must give it effect as written, without 'reading into it exceptions, limitations or conditions that the legislature did not express.' "  Garza v. Navistar International Transportation Corp., 172 Ill. 2d 373, 378 (1996), quoting Solich v. George & Anna Portes Cancer Prevention Center of Chicago, Inc., 158 Ill. 2d 76, 83 (1994).  When the language of a statute is clear, resort to other aids of statutory construction is unnecessary.  Henry v. St. John's Hospital, 138 Ill. 2d 533, 541 (1990).  "When construing a statute, we may consider 'the reason and necessity for the statute and the evils it was

intended to remedy.' " <u>Seasons-4, Inc. v. Hertz Corp.</u>, 338 Ill. App. 3d 565, 571 (2003), quoting <u>In re Marriage of Beyer</u>, 324 Ill. App. 3d 305, 309 (2001). The reason and necessity for pension forfeiture statutes is "to discourage official malfeasance by denying the public servant convicted of unfaithfulness to his trust the retirement benefits to which he otherwise would have been entitled." <u>Kerner v. State Employees' Retirement System</u>, 72 Ill. 2d 507, 513 (1978). "The language of pension statutes must also be liberally construed in favor of the rights of the pensioner." <u>Shields</u>, 204 Ill. 2d at 494.

Defendants rely on <u>Devoney v. Retirement Board of the Policemen's Annuity & Benefit Fund</u>, 199 Ill. 2d 414 (2002), <u>Bloom v. Municipal Employees' Annuity & Benefit Fund</u>, 339 Ill. App. 3d 807 (2003), and <u>Goff v. Teachers' Retirement System</u>, 305 Ill. App. 3d 190 (1999), in support of their contention on appeal that the trial court's decision should be reversed and the Board's decision terminating Bauer's retirement benefits should be reinstated. In addition, defendants rely on the plain language of section 14-149 of the Code.

Bauer's primary contention on appeal is that the trial court correctly construed section 14-149 not to authorize forfeiture of his retirement benefits because the conduct underlying the obstruction of justice occurred nine months after Bauer left his job as Inspector General for the office of the Secretary of State. In support of this contention, Bauer emphasizes the absence of case law applying section 14-149 to "an employee whose conduct occurred after he left the relevant state employment." Bauer argues that <u>Devoney</u>, <u>Bloom</u>, and <u>Goff</u> are distinguishable from the instant case because, unlike those cases:

> "Mr. Bauer did not use his state employment to accomplish the
>
> misconduct at issue. Nor was the misconduct born, in any sense,
>
> from Mr. Bauer's status and position as a state employee. The

> reason is simple. At the time of his October 7, 1999, conversation
> with Ms. Carlson, Mr. Bauer had no status as a state employee. He
> had been absent nine months from the IG department where Ms.
> Carlson worked. Thus, Mr. Bauer had no ability to direct Ms.
> Carlson to do anything."

Bauer further argues that termination of his benefits is inconsistent with the purpose underlying section 14-149 of the Pension Code because he was not convicted of unfaithfulness to his trust since he was not employed as Inspector General when he committed the felony of obstructing justice.

Section 14-149 of the Pension Code states in relevant part:

> "None of the benefits herein provided for shall be paid to
> any person who is convicted of any felony relating to or arising out
> of or in connection with his service as an employee." 40 ILCS
> 5/14-149 (West 2002).

The plain language of section 14-149 of the Code provides that pension benefit disqualification can occur under three circumstances: (1) when the individual "is convicted of any felony *relating to*\*\*\* his service as an employee," (2) when the individual "is convicted of any felony \*\*\* *arising out of* \*\*\* his service as an employee," or (3) when the individual "is convicted of any felony \*\*\* *in connection with* his service as an employee." (Emphasis added.) 40 ILCS 5/14-149 (West 2002).

The Code does not define "relating," "arising," or "connection," and accordingly we look to their plain and ordinary meanings. See Gem Electronics of Monmouth, Inc. v. Department of Revenue, 183 Ill. 2d 470, 477-78 (1998) (noting that "[u]ndefined terms in a statute must be

10

ascribed their ordinary and popularly understood meaning"). Merriam-Webster's Collegiate Dictionary defines "relate" as "to have [a] relationship or *connection*." (Emphasis added.) Merriam-Webster's Collegiate Dictionary 987 (10th ed. 1998). Merriam-Webster's Collegiate Dictionary defines "connection" as "the state of being connected as [a]: *causal* or logical relation or sequence." (Emphasis added.) Merriam-Webster's Collegiate Dictionary 245 (10th ed. 1998). Merriam-Webster's Collegiate Dictionary defines "arise" as "to originate from a source." Merriam-Webster's Collegiate Dictionary 62 (10th ed. 1998). Merriam-Webster's Collegiate Dictionary defines "originate" as "to take or have origin" and defines "origin" as "something that creates, *causes*, or gives rise to another." (Emphasis added.) Merriam-Webster's Collegiate Dictionary 820 (10th ed. 1998). Each term references "causal" or "cause."

We note that Illinois courts have previously construed retirement benefit forfeiture statutes that were nearly identical to section 14-149 and that included the phrases "relating to," "arising out of," and "in connection with." See Devoney, 199 Ill. 2d 414; Bloom, 339 Ill. App. 3d 807; Goff, 305 Ill. App. 3d 190. In resolving the issue before us, we rely on the plain language of the Pension Code, as well as the applicable case law.

In Devoney, a police lieutenant was convicted of federal mail fraud as the result of his involvement in a scheme to defraud an insurance company. Devoney, 199 Ill. 2d at 415. Although the conduct underlying the fraud did not occur while the lieutenant was on duty, the board overseeing the policemen's annuity and benefit fund terminated the lieutenant's pension benefits. Devoney, 199 Ill. 2d at 415-17. The board based its termination upon section 5-227 of the Illinois Pension Code, which includes language that is nearly identical to that at issue in the instant case and that provides for forfeiture of retirement benefits when an officer is convicted of a felony " 'relating to or arising out of or in connection with his service as a policeman.' "

11

Devoney, 199 Ill. 2d at 417, quoting 40 ILCS 5/5-227 (West 1998).

The Illinois supreme court upheld the termination of benefits, concluding that "the circumstances surrounding the crime establish that the offense was related to Devoney's work as a police officer." Devoney, 199 Ill. 2d at 423. In reviewing the board's determination, the supreme court stated that "[w]hen applying the pension disqualification statutes, *** the pivotal inquiry is whether a nexus exists between the employee's criminal wrongdoing and the performance of his official duties." Devoney, 199 Ill. 2d at 419. The supreme court found that the requisite nexus was present concluding as follows: "Because Devoney's participation in the scheme to defraud was the product of his status as a law enforcement official, we believe that the nexus required by section 5-227 of the Pension Code (40 ILCS 5/5-227 (West 1998)) was present." Devoney, 199 Ill. 2d at 423.

In support of its finding that the requisite nexus was present, the supreme court observed that the lieutenant's codefendant cultivated a friendship with him because he was a criminal who considered it advantageous to have police connections. Devoney, 199 Ill. 2d at 423. In addition, the supreme court observed that the lieutenant was aware of his codefendant's criminal past and the two men had a " 'long and unsavory' " relationship during which Devoney had used his position for his codefendant's benefit. Devoney, 199 Ill. 2d at 423. The court in Devoney noted that Devoney's federal indictment did not identify him as a police officer, proof of his employment as a police officer was not necessary to establish his guilt, and his association with Chicago's police department was not mentioned in his written plea. Devoney, 199 Ill. 2d at 422. However, the court believed that "the circumstances surrounding the crime establish[ed] that the offense was related to Devoney's work as a police officer." Devoney, 199 Ill. 2d at 423. Based upon the circumstances surrounding the lieutenant's crime, the supreme court found ample

support for the board's "finding that 'but for the fact that Devoney was a [p]olice [o]fficer of high rank,' he 'would not have been in a position or selected to participate in the scheme to defraud [which led to his conviction.]' " Devoney, 199 Ill. 2d at 423. The court concluded: "Devoney's felony conviction in federal court was 'relat[ed] to or [arose] out of or in connection with his service as a policeman' so as to render him ineligible for his police pension benefits." Devoney, 199 Ill. 2d at 423-24, quoting 40 ILCS 5/5-227 (West 1998).

The dissent, in discussing the "but for" standard used by the majority to determine whether the requisite nexus existed, noted as follows:

> "The majority adopts a 'but for' standard that equates an individual's employment status to his service to the state, and requires only a nexus between the individual's conviction and the employment status. However, the nexus requirement of section 5-227 entails more than a connection between the individual's employment status and the conviction. Were it not so, the legislature could simply have provided that benefits would not be paid to any individual convicted of a felony. The majority's interpretation of section 5-227 renders superfluous the additional provision that the felony relate to or arise out of or in connection with the individual's service to the state. It also does not reflect the intent of the legislature." Devoney, 199 Ill. 2d at 428-29 (Freeman, J., dissenting, joined by Kilbride, J.).

Under the test articulated by the Devoney majority, the requisite nexus exists if the facts and circumstances establish that but for the pension claimant's status as a state employee, he

would not have been in a position to commit the felony in question. Devoney, 199 Ill. 2d at 423 (but for the fact Devoney was a police officer, he would not have been in a position to defraud). The Devoney majority found the nexus required by the Pension Code was present "[b]ecause Devoney's participation in the scheme to defraud was the product of his status as a law enforcement official." Devoney, 199 Ill. 2d at 423. Under the test articulated in the Devoney dissent, the nexus "entails more than a connection between the individual's employment status and the conviction," and must satisfy the intent of the legislature as reflected by the plain language of the statute in that the felony conviction "relate[s] to or arise[s] out of or in connection with the individual's service to the state." Devoney, 199 Ill. 2d at 429 (Freeman, J., dissenting, joined by Kilbride, J.).

Here, we look to the facts and circumstances surrounding Bauer's felony conviction to determine whether his obstruction of justice was the product of his state employee status as Inspector General, thereby, under Devoney, satisfying the "but for" test and demonstrating the nexus between Bauer's criminal wrongdoing and Bauer's service as Inspector General. We also examine those facts and circumstances to determine whether Bauer's obstruction of justice satisfied the plain language of the statute as a felony relating to or arising out of or in connection with his service as Inspector General, as articulated in the Devoney dissent.

The circumstances relevant to our resolution of the above issue are factually demonstrated by the words of Bauer's plea of guilty and by the words spoken by Bauer in his telephone conversation with Janet Carlson, his former secretary. Bauer, in his plea of guilty to obstruction of justice admitted, during the telephone conversation with Janet Carlson:

> "[He] did corruptly attempt to persuade another person, and did
>
> engage in misleading conduct towards another person, namely

14

[Janet Carlson], with intent to cause and induce [Carlson] or another to destroy and conceal an object with intent to impair the object's integrity and availability for use in the grand jury investigation *** in that defendant Bauer attempted to persuade [Carlson] to destroy and conceal certain documents *** which documents were relevant to federal Grand Jury Investigation No. 98 GJ 596, which investigation related to corruption in the licensing process at the SOS Office[,] in violation of Title 18, United States Code, Sections 1512(b)(2)(B) and 2.

More specifically, on October 7, 1999, during a recorded phone conversation between defendant Bauer and a cooperating individual, [Carlson], who unbeknownst to defendant Bauer was then cooperating with Operation Safe Road, the two discussed sensitive documents *** which [Carlson] indicated [she] had come across during the course of [her] work. During the conversation, defendant Bauer requested, and [Carlson] provided, a description of each category of documents. The documents discussed that were responsive to the September 1998 subpoena included, among others, a Bauer-related memo referring to the Guzman investigation and the likelihood that Guzman obtained his license fraudulently at the McCook facility. After [Carlson] requested direction from defendant regarding what to do with the "sensitive" documents, defendant suggested to [Carlson] that [she] dispose of

15

that as best as [she] could, intending by that suggestion to

corruptly persuade [Carlson] to destroy or otherwise conceal the

documents the best [she] could so that they would not be available

to the grand jury."

As Inspector General, Bauer headed the Department which was responsible for investigating allegations of wrongdoing involving SOS employees. By the spring of 1994, Bauer was aware his office was investigating Marion Seibel, who was employed by the SOS, for fraudulently selling commercial driver's licenses. In November 1994, IG Investigator Russell Sonneveld reported to Bauer that Ricardo Guzman, a truck driver who had been involved in a fatal collision killing six children, had obtained his commercial driver's license from the same facility where Seibel worked. In addition, Sonneveld indicated that Guzman possibly obtained his license through the fraudulent conduct of SOS employees.

Bauer denied Investigator Sonneveld permission to open an IG Department case or conduct further investigation. Thereafter, Bauer told Willie Thompson, the chief deputy director of the SOS Department of Police, that Bauer himself was "actively pursuing" an investigation of the Guzman incident. Following this conversation with Bauer, Thompson wrote a memo to the Director of the SOS Department of Police, Jack Peccararo, stating that he had received a phone call from Bauer and describing the substance of what Bauer told him during that call. The Thompson memo noted that Bauer told Thompson he was actively pursuing the Guzman case and Bauer believed there was a possibility Guzman obtained his commercial driver's license illegally from the McCook driver's facility. The memo further noted that Bauer told Thompson there was an ongoing internal investigation of that facility and that this information should be kept as confidential as possible. The Thompson memo was in part the subject of Bauer's federal

plea of guilty to obstruction of justice. It was among the documents Bauer admitted in his plea he intended to "corruptly persuade Carlson to destroy or otherwise conceal," so "that they would not be available to the grand jury."

As reflected in Bauer's plea of guilty, Carlson told Bauer during the phone conversation on October 7, 1999, that the Joliet Secretary of State's office had sent a box of "sensitive" documents, including the Thompson memo regarding Guzman. Carlson called Bauer to see what he thought she should do with the documents. It was during that conversation that Bauer attempted to have Carlson destroy or conceal documents including the Thompson memo. Bauer asked Carlson what the memo said, and the following exchange transpired:

"[BAUER]: What does that say?

[CARLSON]: *** [I]t is a memo to Jack Peccararo from Will Thompson regarding Ricardo Guzman[;] it says 'Director Dean Bauer - Inspector General's Office called yesterday to advise he is actively pursuing a case on those individuals - Guzman while driving a tractor trailer truck in the state of Wisconsin sometime during last week - lost a portion or an object of his load - the object struck the van - puncturing the gasoline tank, creating a fire at which time several individuals died. Director Bauer advised there is a strong possibility that this individual obtained a CDL [commercial driver's license] illegally. Director Bauer advised any information or inquiries regarding this individual be forwarded to him immediately. At this time Director Bauer also believes that this individual obtained a CDL from McCook Driver's facility at

17

which time there is also an ongoing internal investigation. Subject

matter should be kept as confidential as possible.' "

Carlson advised Bauer he had been copied on the memo and told Bauer the memo caught her

attention because of "stuff in the newspapers." After more discussion, the following exchange

took place:

> "CARLSON: Well, okay, like I said I was trying to go
>
> through some stuff[.] I wanted to make sure.
>
> BAUER: I just as soon this stuff - if it's going to raise an
>
> issue - we dispose of it as best we can.
>
> CARLSON: Okay.
>
> BAUER: I don't want anyone to get in trouble either."

That telephone conversation Bauer had with Thompson, together with the facts

surrounding Bauer's felony conviction for obstructing justice, satisfiy the "but for" test

articulated by the Devoney majority. But for the fact that Bauer had been Inspector General, he

would not have been in a position to obstruct justice by attempting to have Carlson conceal or

destroy Thompson's memo. See Devoney, 199 Ill. 2d at 423 (but for the fact Devoney was a

police officer, he would not have been in a position to defraud.) Indeed, Bauer was Inspector

General when the federal government's investigation into the licensing process at the SOS

began and when the memo sought by the grand jury pursuant to that investigation was written

by Thompson, an SOS employee. The memo which Bauer attempted to have Carlson, his

former secretary, conceal or destroy reflected Bauer's description of his conduct regarding the

Guzman case while performing his official duties as Inspector General. But for Bauer's

18

conversation with Thompson, which concerned Bauer's official responsibilities and occurred while Bauer was Inspector General, as reflected in the Thompson memo, Bauer would not have been in a position to obstruct justice by attempting to have Carlson, his former secretary, conceal or destroy the memo. Indeed, Bauer's attempt to have Carlson conceal or destroy the documents relevant to the federal investigation of the SOS was the product of his state employee status as Inspector General.

For the reasons previously discussed, we find that there was a nexus between Bauer's obstructing justice by intending to persuade Carlson to dispose of the documents and his employment status as Inspector General. The nexus required by the Pension Code was present because Bauer's obstruction of justice was a product of his status as Inspector General. See Devoney, 199 Ill. 2d at 423. Thus, the facts satisfy the "but for" test articulated by the majority in Devoney because but for the fact that Bauer had been Inspector General, he would not have been in a position to obstruct the federal investigation of the Secretary of State's office. See Devoney, 199 Ill. 2d at 423.

The facts surrounding Bauer's obstruction of justice further satisfy the plain language requirement for pension forfeiture discussed in the Devoney dissent, namely, that the felony relate to or arise out of or in connection with the individual's service to the state. Devoney, 199 Ill. 2d at 428-29 (Freeman, J., dissenting, joined by Kilbride, J.). Under this standard, the nexus requirement for pension forfeiture entails more than a causal connection between the individual's employment *status* and the felony conviction. The plain language of the statute requires a causal connection between the felony in question and the employee's *service* to the state. As noted earlier, the plain meaning and definition of each of the applicable terms in

19

section 14-149 reference "causal" or "cause."

Applying the plain language of section 14-149 to facts of the instant case, we find that there was a causal connection between Bauer's felony and his service to the state. The record reflects the federal grand jury subpoena sought documents created during Bauer's tenure as Inspector General. Bauer pled guilty to obstruction of justice for attempting to have Carlson, an employee of the Inspector General's office and Bauer's former secretary, conceal or destroy documents, including a memo that described Bauer's conduct as Inspector General. The obstruction occurred during the above-noted telephone conversation Bauer had with Carlson. That telephone conversation directly related to Bauer's official responsibilities while Bauer was serving as Inspector General and was documented in the memo written by Thompson that Bauer attempted to have Carlson conceal or destroy.

The documents, including the memo which Bauer attempted to have Carlson conceal or destroy, were the subject of a federal investigation of corruption in the licensing process at the SOS which began while Bauer served as Inspector General and was ongoing at the point in time when Bauer obstructed justice by attempting to have Carlson conceal or destroy the documents. Bauer's conduct as Inspector General regarding the Guzman case was specifically described in the memo Bauer admitted he attempted to have Carlson destroy or conceal. He admitted in his plea agreement that he intended that the Thompson memo together with other sensitive documents relevant to the federal investigation would not be available to the federal grand jury investigating corruption in the office of the Secretary of State. The record factually demonstrates that Bauer in his plea of guilty admitted obstructing justice by attempting to have Carlson destroy documents including, "a Bauer-related memo referring to the Guzman

investigation and the likelihood that Guzman obtained his license fraudulently at the McCook facility." Bauer further admitted in his plea of guilty that he suggested that Carlson dispose of these "sensitive" documents "intending by that suggestion to corruptly persuade [Carlson] to destroy or otherwise conceal the documents the best [Carlson] could so that they would not be available to the grand jury."

The above facts and circumstances establish a causal connection between Bauer's conduct of obstructing justice and his service to the state as Inspector General. But for Bauer's conversation with Thompson, which directly concerned Bauer's official responsibilities and occurred while Bauer was serving as Inspector General, Thompson would not have written the memo in question and Bauer would not have obstructed justice by attempting to have Carlson, his former secretary, conceal or destroy the memo. Bauer's obstruction was connected or related to documents reflecting his service as Inspector General. The Thompson memo reflected Bauer's conduct as Inspector General regarding investigation of the Guzman accident and the likelihood that Guzman obtained his license fraudulently at the McCook facility of the Secretary of State's office. Bauer attempted to conceal or destroy SOS documents, including the memo, relevant to the federal investigation of corruption in the licensing process at the SOS office to prevent their use by the federal grand jury in the investigation of the SOS which began while Bauer was serving as Inspector General and was ongoing at the point in time when he obstructed justice. In light of the causal connection between Bauer's obstruction of justice and his service as Inspector General, we conclude Bauer was convicted of a felony relating to, arising out of, or in connection with his service as Inspector General. For the reasons previously discussed, the facts in the instant case satisfy the Devoney "but for" test as well as the plain language of the pension forfeiture statute in that Bauer was convicted of a "felony

21

relating to or arising out of or in connection with his service as an employee."

The principles articulated in <u>Devoney</u> were further discussed in <u>Bloom</u>.  In <u>Bloom</u>, a Chicago alderman (Bloom) pleaded guilty to filing a federal income tax return for his private real estate business which falsely listed payments from John Christopher as "rental income." <u>Bloom</u>, 339 Ill. App. 3d at 809, 812-13.  In fact, Bloom accepted the money in exchange for using his name, official position, and influence as an alderman to assist Christopher in obtaining and operating sites for a private rock-crushing business.  <u>Bloom</u>, 339 Ill. App. 3d at 810, 812-13.  In pleading guilty, Bloom admitted that some of the funds falsely categorized on his return were amounts paid to him in exchange for his improper use of his public office.  <u>Bloom</u>, 339 Ill. App. 3d at 809.  Following his conviction, Bloom was denied his pension benefits based upon a Code provision which was nearly identical to the provision at issue in the instant case.  <u>Bloom</u>, 339 Ill. App. 3d at 809.  That provision provided for the forfeiture of benefits of " 'any person who is convicted of any felony relating to or arising out of or in connection with his service as a municipal employee.' "  <u>Bloom</u>, 339 Ill. App. 3d at 810, quoting 40 ILCS 5/8-251 (West 1998).

On appeal, the reviewing court recognized that the issue before it, under <u>Devoney</u>, was whether a nexus existed between Bloom's wrongdoing and the performance of his official duties.  <u>Bloom</u>, 339 Ill. App. 3d at 814-15.  The reviewing court noted that <u>Devoney</u> "demonstrates that analysis of the 'relating to, arising out of or connected with' language of the pension forfeiture statutes is not concluded upon a showing that the disqualifying felony, by its own terms, does not call for proof of official misconduct."  <u>Bloom</u>, 339 Ill. App. 3d at 812.  The court also recognized that <u>Devoney</u> did not mandate the application of the "but for" test in every nexus analysis.  In fact, the court in <u>Bloom</u> identified the "substantial factor" test as an alternative means for resolving the nexus issue.  <u>Bloom</u>, 339 Ill. App. 3d at 815.  Under the

22

substantial factor test, "the [causal] link is established if the questioned cause 'was a material element and a substantial factor' in bringing about the subsequent occurrence." Bloom, 339 Ill. App. 3d at 815, quoting Thacker v. UNR Industries, Inc., 151 Ill. 2d 343, 354-55 (1992).

The court reviewed Bloom's admissions and found that the improper payments which Bloom received in exchange for using his official position and influence as an alderman to assist Christopher in obtaining and operating sites for a private rock-crushing business were material elements and substantial factors resulting in his tax conviction. Bloom, 339 Ill. App. 3d at 816. Applying the substantial factor test, the court concluded that there was a nexus between Bloom's felony of filing of a false federal tax return and his public service. Bloom, 339 Ill. App. 3d at 816.

Here, as in Bloom, there was a nexus between Bauer's felony of obstructing justice by attempting to persuade Carlson to conceal or destroy documents subpoenaed by the federal grand jury and his service as Inspector General for the Secretary of State. Bauer's conduct as Inspector General was the subject of the memo Bauer attempted to have Carlson conceal or destroy, thereby obstructing the investigation of the federal grand jury. Bauer's service, for the reasons previously discussed, was a material element and a substantial factor in bringing about the obstruction of justice.

The court in Bloom noted that an approach "parallel" to the "substantial factor" test was adopted in Goff, 305 Ill. App. 3d 190, appeal denied, 185 Ill. 2d 623 (1999). Bloom, 339 Ill. App. 3d at 815. In Goff, the plaintiff, a retired school teacher and principal, pleaded guilty to six counts of aggravated criminal sexual abuse. Goff, 305 Ill. App. 3d at 191. The plaintiff first

23

met the victims while volunteering as a Boy Scout leader and as a church camp counselor and later abused them after they began attending the school where he was the principal. Goff, 305 Ill. App. 3d at 193-94. Although the conduct underlying the felonies did not occur on school property or at a school-related event, the Illinois Teachers' Retirement System revoked the plaintiff's pension. Goff, 305 Ill. App. 3d at 191-92. Like the board in Devoney, it based its revocation on a section of the Code that is nearly identical to the one at issue in the instant case and that provides for forfeiture of pension benefits of " 'any person who is convicted of any felony relating to or arising out of or in connection with his or her service as a teacher.' " Goff, 305 Ill. App. 3d at 193, quoting 40 ILCS 5/16-199 (West 1994).

Goff appealed the revocation, arguing that his pension could be revoked only if the felony in question actually took place on school time or school grounds or during an extracurricular activity for which he was serving as a school chaperon. Goff, 305 Ill. App. 3d at 195. We rejected his argument, concluding that such a construction was far too narrow and noting that " '[a]n injury can be said to arise out of one's employment if its origin is in *some way* connected with the employment so that there is a causal connection between the employment and the *** injury.' " (Emphasis in original.) Goff, 305 Ill. App. 3d at 195, quoting Consolidated R. Corp. v. Liberty Mutual Insurance Co., 92 Ill. App. 3d 1066, 1068-69 (1981). Like the felonies in Goff, Bauer's felony of obstruction of justice can be said to arise out of his employment as Inspector General because, for the reasons previously discussed, the origin of the felony of obstruction of justice was connected to Bauer's employment so that there was a causal connection between the employment and the felony of obstruction of justice.

We recognize Bauer was no longer serving as Inspector General when he committed the felony of obstruction of justice, and that the pension claimants in Devoney, Goff, and

24

Bloom

were still serving in the state offices to which their felonies related at the time they committed their respective felonies. We also recognize that the passage of time between the date Bauer stopped serving as Inspector General and the date he committed obstruction of justice is a logical factor to consider in determining whether a nexus exists between his state employment and his felony. We reject, however, Bauer's argument that the passage of time between two events is a dispositive factor for determining whether a nexus exists between them. Indeed, neither the supreme court in Devoney nor the appellate court in Goff and Bloom stated that the passage of time between state employment and the commission of felony somehow negates the possibility that a nexus can exist between the two. Furthermore, the plain language of section 14-149 does not state that only those felonies which are committed while the pension claimant is employed by the state may relate to or arise out of or in connection with his service as an employee. Nor does section 14-149 state a felony cannot relate to, arise out of or in connection with a particular state job if the felony occurs after the claimant has left the job. We decline to read into section 14-149 a requirement for forfeiture which is inconsistent with its plain language. The conduct for which Bauer was convicted was directly and inherently related to his service as Inspector General for the Secretary of State. The investigation into corruption began while Bauer was serving as Inspector General and Bauer's felony obstructed that federal investigation. The fact Bauer did not obstruct justice until after he left the office of the Secretary of State does not mean the obstruction was not a "felony relating to or arising out of or in connection with his service as an employee."

In further support of his contention that he was entitled to benefits, Bauer cites two non-Illinois cases: Wallace v. City of Fresno, 42 Cal. 2d 180, 265 P.2d 884 (1954), and Landry v.

Board of Trustees of Police Pension Fund, 58 So. 2d 296, 298 (La. App. 1952). Bauer's reliance on these cases is misplaced. The reviewing courts in both Wallace and Landry did reverse the termination of pension benefits to police officers who committed felonies after they had retired. Wallace, 42 Cal. 2d at 181, 186, 265 P.2d at 885, 887; Landry, 58 So. 2d at 297-98. However, the language of the forfeiture provisions at issue in those cases was different from the language at issue in the instant case and did not require those courts to review whether there was a nexus between the felonies in question and the plaintiffs' service as officers. Wallace, 42 Cal. 2d at 182-83, 265 P.2d at 885, 886; Landry, 58 So. 2d at 298. In fact, in Wallace, the court reinstated the plaintiff's benefits based upon its finding that an amendment to the pension ordinance made after the plaintiff began working as an officer unreasonably impaired his contractual pension rights. Wallace, 42 Cal. 2d at 184-85, 265 P.2d at 886-87.

Finally, we reject Bauer's argument that he was not convicted of unfaithfulness to his trust because he was not serving as Inspector General when he obstructed justice. Our decision is consistent with the purpose underlying section 14-149 of the Pension Code, which is "to discourage official malfeasance by denying the public servant convicted of unfaithfulness to his trust the retirement benefits to which he otherwise would have been entitled." Kerner, 72 Ill. 2d at 513. Bauer's malfeasance consisted of obstructing justice by attempting to persuade Carlson to conceal or destroy SOS documents, including the Thompson memo, which concerned conduct which occurred while he was employed as Inspector General and related to the performance of his duties as Inspector General. These documents were relevant to the federal government's investigation into corruption at the SOS office.

We believe the trust citizens place in public employees can in some circumstances extend beyond the period of employment with respect to certain types of conduct, including

26

conduct by a former employee in response to an ongoing federal investigation into corruption in that former employee's office while he was working there. Construing section 14-149 of the Pension Code to apply exclusively to felonies committed while a person is still employed in a particular position would be inconsistent with its purpose of deterring state employees from engaging in official malfeasance. Adoption of such a construction of section 14-149 would send a message to state employees that their retirement benefits will not be jeopardized if, after retiring, they obstruct justice by attempting to prevent a federal grand jury from obtaining documents related to their former state service for purposes of a federal investigation into corruption in a state office which began while they served that state office, and was ongoing at the point in time they obstructed justice. Such a message was not the intent of the legislature when it enacted section 14-149 of the Pension Code.

### CONCLUSION

For the reasons previously discussed, in the factual context of this case, we find Bauer was convicted of a "felony relating to or arising out of or in connection with his service as" Inspector General for the office of the Illinois Secretary of State. Accordingly, we conclude the Board's decision to terminate Bauer's pension benefits pursuant to section 14-149 of the Illinois Pension Code was proper.

We reverse the circuit court's order and reinstate the Board's decision.

Reversed.

McNULTY, P.J., and FITZGERALD SMITH, J., concur.

1-03-1589