JANE DOE, Plaintiff-Appellee, v. SANTOSH P. CHAND *et al.*, Defendants-Appellants.

Fifth District    No. 5—01—0355

Opinion filed September 4, 2002.—Rehearing denied January 7, 2003.

811

KUEHN, J., concurring in part and dissenting in part.

Thomas J. Hayek, of Behr, McCarter & Potter, P.C., of St. Louis, Missouri, and Karen L. Kendall, of Heyl, Royster, Voelker & Allen, of Peoria, for appellants.

Jodee Favre and Laura B. Allen, both of Favre & Allen, of Belleville, for appellee.

JUSTICE RARICK delivered the opinion of the court:

The plaintiff, Jane Doe, filed a multicount complaint in the circuit

court of St. Clair County against Dr. Santosh P. Chand and Dr. Santosh P. Chand, M.D., Ltd. (defendants), alleging, *inter alia*, a violation of the AIDS Confidentiality Act (the Act) (410 ILCS 305/1 *et seq.* (West 1998)).

Doe testified that in February 1999 she learned that her husband had tested positive for the human immunodeficiency virus (HIV). She stated that she did not immediately seek to be tested because she was certain what the results would be and she was not ready to find out. On April 17, 1999, Doe went to Dr. Chand's office to pick up her mother, who was also a patient of Dr. Chand's. When Doe told Dr. Chand about her husband, Dr. Chand suggested that she be tested, and she agreed. Doe testified that Dr. Chand did not provide a written consent form or give her any written information concerning the testing or the availability of counseling. Doe stated that she called Dr. Chand's office on several occasions to inquire about the results of her HIV test. Each time she was told that the test results were not in. Doe stated that she learned of the results from her sister, Pamela Randolph. Doe and her mother had gone to Randolph's house. When they arrived, Randolph told her that she had been informed by Dr. Chand that Doe had tested positive for HIV. Doe also testified that she had spoken with several other persons who stated that they knew Doe had HIV or AIDS and that they had learned of such from Dr. Chand.

Doe further testified that in May 2000 she took a leave of absence from her job as a loan processor at the local credit union. Doe stated that many of Dr. Chand's patients were customers of the credit union and that she was constantly worried about whether they knew of her condition. Doe moved to Chicago and lived with a friend. While there, she worked as a bank teller. Prior to trial, Doe relocated to Champaign, Illinois.

Barbara Fergeson testified that she was a patient of Dr. Chand's and knew Doe. In July 1999 she encountered Doe in a local shopping mall. During their conversation, Doe disclosed that her husband had AIDS and that he had given her AIDS. Fergeson stated that about a month later she was in Dr. Chand's office and mentioned that she had seen Doe. At that time Dr. Chand stated that Doe had AIDS. Lisa Mohammed, Dr. Chand's phlebotomist, and Angela Hubbard, the receptionist, were present at the time.

Pamela Randolph, Doe's sister, testified that Dr. Chand called her at home and told her that Doe had tested positive for HIV. According to Randolph, Dr. Chand felt that Doe should get the news from a family member. Randolph further testified that several months later she noticed that Doe was very upset. When Randolph asked why, Doe stated that she had been hearing rumors that others knew of her condition and that Dr. Chand had obviously told other people.

Nancy White testified that she was a patient of Dr. Chand's and knew Doe from Dr. Chand's office. White testified that she was in Dr. Chand's office when Dr. Chand called her back into an examining room and told her to stay away from Doe because she had AIDS.

Lisa Mohammed testified that she was a phlebotomist and worked in Dr. Chand's office. Mohammed stated that after being informed that Doe's test results were positive, Dr. Chand asked her if she should call Doe's sister because she did not know how Doe would handle the information. Mohammed responded that Dr. Chand knew best how to handle her patients. Mohammed did not remember Dr. Chand telling Barbara Fergeson that Doe had AIDS.

Natasha Thornton testified that she was a patient of Dr. Chand's. She was seeing Dr. Chand in an effort to get pregnant. She testified that Dr. Chand had called her and asked her to come to the office. Once she was there, Dr. Chand informed her that she had tested positive for a sexually transmitted disease. When Thornton disputed the test results, Dr. Chand said that she was just like Doe, who did not want to believe that she had AIDS.

Over defendant's objections, Doe introduced the testimony of Judith Murashige, an art therapist. Murashige testified that she had treated Doe for emotional issues related to having been diagnosed HIV positive and to Dr. Chand's disclosure of her HIV status.

Introduced into evidence was the deposition of Dr. Paul L'Ecuyer, an infectious-disease specialist. Dr. L'Ecuyer testified that Doe was his patient and had been referred to him by her insurance company for treatment of her HIV infection. He first saw Doe on May 28, 1999. Doe continued to see Dr. L'Ecuyer on a regular basis. At one of their follow-up appointments, Doe stated that she was upset with Dr. Chand for having disclosed to several people that she was HIV positive. Dr. L'Ecuyer opined that Doe suffered from anxiety and depression and that Dr. Chand's disclosure of Doe's HIV status was a contributing cause.

Dr. Chand testified that she called Doe at home. Doe's mother answered the phone and asked about the test results. Dr. Chand told her mother that she did not know what to say, that they should talk to Doe, and that she was not happy. Dr. Chand testified that Pamela Randolph called. Dr. Chand told Randolph that she was not happy and to have Doe call her because she needed to get some more work-up done on her.

On May 13, 1999, Doe came to Dr. Chand's office for further testing. Dr. Chand discussed the results of the test with Doe and the need for follow-up testing. Dr. Chand denied disclosing the results of the test to Doe's mother, her sister, or anyone else.

Prior to trial, Doe voluntarily dismissed all but the count under the Act. Dr. Chand's request for a jury trial was subsequently denied by the trial court. After a bench trial, the trial court found that Doe had proved "numerous" violations of the Act, some of which were negligent and some of which were intentional or reckless, and that she had suffered emotional and nonemotional damages as a result. Based upon these findings, the trial court awarded Doe $600,000 in actual damages and $300,000 in punitive damages.

On appeal, defendants argue first that Doe's counsel, JoeDee Favre, should have been disqualified. Defendants contend that from June 1996 through January 1998, attorney Favre represented defendants on numerous matters relating to Dr. Chand's suspension of privileges at numerous hospitals for inadequate record-keeping, complaints brought by the Illinois Department of Professional Regulation regarding Dr. Chand's license and record-keeping, a social security matter involving an order of protection with a former patient, and a medical malpractice matter. Defendants maintain that during this time, attorney Favre was provided with unrestricted access to defendant's private office and that defendants' employees provided attorney Favre with patient records. Because of the prior representation, defendants argue, attorney Favre had valuable insight into the policies and procedures of defendants' office, including the manner in which records were maintained, which is the subject matter of several of the allegations made by Doe.

The determination of whether counsel should be disqualified is directed to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Franzoni v. Hart Schaffner & Marx*, 312 Ill. App. 3d 394, 726 N.E.2d 810 (2000). An abuse of discretion occurs when no reasonable person would agree with the position adopted by the trial court. *Gerber v. Hamilton*, 276 Ill. App. 3d 1091, 659 N.E.2d 443 (1995). Where the question on appeal involves the resolution of factual issues, the trial court's determinations will not be disturbed unless they are unsupported by the evidence in the record. *International Insurance Co. v. City of Chicago Heights*, 268 Ill. App. 3d 289, 643 N.E.2d 1305 (1994).

Rule 1.9 of the Illinois Rules of Professional Conduct, which defines the scope of an attorney's obligation to refrain from representing a person with interests that are materially adverse to the interest of a former client, provides:

> "(a) A lawyer who has formerly represented a client in a matter shall not thereafter:
>
> > (1) represent another person in the same or a substantially related matter in which that person's interests are materially

adverse to the interests of the former client, unless the former client consents after disclosure; or
    (2) use information relating to the representation to the disadvantage of the former client, unless:
      (A) such use is permitted by Rule 1.6; or
      (B) the information has become generally known." 134 Ill. 2d R. 1.9.

In *Schwartz v. Cortelloni*, 177 Ill. 2d 166, 685 N.E.2d 871 (1997), our supreme court held:

"Under Rule 1.9 *** an attorney's subsequent representation of a person with interests adverse to a former client is prohibited only if the matters involved in the two representations are the same or substantially related. [Citations.] The party seeking disqualification bears the burden of establishing that the present and former representations are substantially related. [Citation.] If a substantial relationship between the two matters is not shown, then no breach of the duty of confidentiality will be found. [Citation.]

Attorney disqualification is a drastic measure because it destroys the attorney-client relationship by prohibiting a party from representation by counsel of his or her choosing. [Citation.] Thus, caution must be exercised to guard against motions to disqualify being used as tools for harassment." *Schwartz*, 177 Ill. 2d at 177-78, 685 N.E.2d at 877.

■ In determining whether a substantial relationship exists between two representations, a careful examination of the factual context of the judgment matters of both representations is necessary in order to determine whether disqualification is required. See *Hannan v. Watt*, 147 Ill. App. 3d 456, 497 N.E.2d 1307 (1986). In *Schwartz*, our supreme court adopted the three-step analysis set forth in *La Salle National Bank v. County of Lake*, 703 F.2d 252 (7th Cir. 1983), for making such determination. Under the *La Salle* inquiry, the court must first make a factual reconstruction of the scope of the former representation. It must then determine whether it is reasonable to infer that the confidential information allegedly given would have been given to a lawyer representing a client on those matters. Finally, the court must consider whether the information is relevant to the issues raised in the litigation pending against the former client. *Schwartz*, 177 Ill. 2d at 178, 685 N.E.2d at 877, citing *La Salle*, 703 F.2d at 256.

In the present case, defendants filed a motion to disqualify attorney Favre, arguing that through her prior representation of Dr. Chand, she learned confidential information, including: (1) Dr. Chand's dealing with the National Practitioner Databank, (2) information from current and former employees concerning Doe and Doe's witnesses,

(3) the manner in which Dr. Chand tested patients for HIV or AIDS and informed them of the results, and (4) Dr. Chand's dealings with various hospitals concerning staff privileges and her record-keeping. Both parties submitted affidavits. In her affidavit in support of the motion to disqualify, Dr. Chand averred that Favre visited her office frequently, visiting both her and her staff. Dr. Chand further averred that as a result, Favre had the opportunity to observe how laboratory results were delivered and placed in patient records. Dr. Chand also made that statement because through her representation Favre became familiar with how Dr. Chand's office maintained records and confidential patient information. In her affidavit, attorney Favre disputed the frequency with which she visited Dr. Chand's office and denied seeing or having any knowledge of how test results were handled or how patients were tested for HIV or AIDS or how they were informed of the results.

■ Reviewing the record, we cannot say that the trial court abused its discretion in denying the motion to disqualify. Defendants offer only the vaguest allegations that attorney Favre obtained confidential information relevant to the current litigation, and they offer no specifics as to the nature of this confidential information or how it is relevant to the current litigation. Defendants contend that attorney Favre was in a position to see how Dr. Chand maintained her records and received and reported test results. Favre denied these allegations, however, and the trial court apparently found her more credible on this issue. In any event, such generalized allegations are wholly insufficient to meet the defendants' burden of demonstrating a substantial relationship between the current and former representations or to justify the drastic step of disqualifying Doe's chosen counsel.

Defendants argue next that they were entitled to a trial by jury. Defendants maintain that the essence of Doe's complaint is that the defendants improperly disclosed that Doe had tested positive for HIV and that she suffered from AIDS, that such disclosures were false, and that defendants tested Doe for HIV without obtaining her informed consent. Defendants contend that Doe could have sought relief for each of these claims through the common law causes of action for breach of contract, invasion of privacy, false light, or the tort of outrage, each of which Doe included in her original complaint. Defendants maintain that the Act did not create any new causes of action but that it merely codified existing causes of action and set forth requirements for a written informed consent. We do not agree.

■ In Illinois, the right to a trial by jury "only attaches in those actions where such right existed under the English common law at the time the constitution was adopted." *Martin v. Heinold Commodities,*

*Inc.*, 163 Ill. 2d 33, 73-74, 643 N.E.2d 734, 753 *(1994)*. The test of whether or not the right to a jury trial exists in a given case depends on the nature of the controversy rather than the form of the action. *Flaherty v. Murphy*, 291 Ill. 595, 126 N.E. 533 (1920).

■ Section 13 of the Act (410 ILCS 305/13 (West 1998)) provides for a right of action for any violation of the Act itself or for a violation of any regulation promulgated by the Department of Public Health pursuant to section 16 thereof (410 ILCS 305/16 (West 1998)). There are numerous provisions of the Act the violation of which gives rise to no cause of action at common law. For example, section 5 of the Act provides that no physician may order an HIV test without making available to the person being tested information about the meaning of the test results, the availability of additional testing, and the availability of referrals for future information or counseling. 410 ILCS 305/5 (West 1998). No action for failure to provide such information exists at common law. Section 9 of the Act bars, with few exceptions, any person from disclosing the identity of anyone who has submitted to an HIV test, or the results thereof. 410 ILCS 305/9 (West 1998). No such broad right exists at common law for a person submitting to an HIV test. Section 10 provides that no person to whom test results have been disclosed may disclose the test results to another person, except as authorized by section 9. 410 ILCS 305/10 (West 1998). Section 6 requires that written informed consent be provided by using a coded system which does not link the identity of the individual with the test result. 410 ILCS 305/6 (West 1998). There is no requirement at common law that such a system be used to give informed consent. Moreover, section 3(d) of the Act provides:

" 'Written informed consent' means an agreement in writing executed by the subject of a test or the subject's legally authorized representative without undue inducement or any element of force, fraud, deceit, duress or other form of constraint or coercion, which entails at least the following:

(1) a fair explanation of the test, including its purpose, potential uses, limitations and the meaning of its results; and

(2) a fair explanation of the procedures to be followed, including the voluntary nature of the test, the right to withdraw consent to the testing process at any time, the right to anonymity to the extent provided by law with respect to participation in the test and disclosure of test results, and the right to confidential treatment of information identifying the subject of the test and the results of the test, to the extent provided by law." 410 ILCS 305/3(d) (West 1998).

In a common law action based upon failure to obtain informed consent, "informed consent" means consent obtained from a patient by a health

care provider after the disclosure by such provider of those factors which a reasonably well-qualified provider would disclose under the same or similar circumstances. See Illinois Pattern Jury Instructions, Civil, No. 105.07.01 (3d ed. 1990). The requirement for obtaining informed consent under the Act is both more comprehensive and more specific. Finally, in section 2(2) our legislature found, as one of its reasons for enacting the Act, that "[d]espite existing laws, regulations[,] and professional standards which require or promote the informed, voluntary[,] and confidential use of tests designed to reveal HIV infection, many members of the public are deterred from seeking such testing because they misunderstand the nature of the test or fear that test results will be disclosed without their consent." 410 ILCS 305/2(2) (West 1998). Clearly, our legislature felt that additional protection was needed to ensure the confidentiality of HIV testing. We conclude that in enacting the Act, our legislature created new rights for persons wishing to obtain confidential HIV testing and a new cause of action unknown at common law to protect those rights.

Defendants next argue that the trial court erred in awarding Doe punitive damages. Defendants contend that Doe was not entitled to punitive damages because the plain language of the Act does not provide for an award of punitive damages.

Section 13 of the Act provides:

"Any person aggrieved by a violation of this Act or of a regulation promulgated hereunder shall have a right of action in the circuit court and may recover for each violation:

(1) Against any person who negligently violates a provision of this Act or the regulations promulgated hereunder, liquidated damages of $1000 or actual damages, whichever is greater.

(2) Against any person who intentionally or recklessly violates a provision of this Act or the regulations promulgated hereunder, liquidated damages of $5000 or actual damages, whichever is greater.

(3) Reasonable attorney fees.

(4) Such other relief, including an injunction, as the court may deem appropriate." 410 ILCS 305/13 (West 1998).

It is well-settled that the cardinal rule of statutory construction is to ascertain and give effect to the intent of the legislature. *American Standard Insurance Co. of Wisconsin v. Gnojewski*, 319 Ill. App. 3d 970, 747 N.E.2d 367 (2001). The most reliable indicator of legislative intent is the language of the statute, which is given its plain and ordinary meaning. *First Bank & Trust Co. of O'Fallon v. King*, 311 Ill. App. 3d 1053, 726 N.E.2d 621 (2000). Where the language of the statute is clear and unambiguous, the statute will be enforced as writ-

ten and courts will not resort to other aids for construction. *Goff v. Teachers' Retirement System*, 305 Ill. App. 3d 190, 713 N.E.2d 578 (1999). When ascertaining legislative intent from the language of the statute, a court will examine the language of the statute as a whole, considering each part or section in connection with every other part or section. *Monat v. County of Cook*, 322 Ill. App. 3d 499, 750 N.E.2d 260 (2001).

■ Section 13 provides for liquidated or actual damages but does not specifically provide for punitive damages. It does, however, provide for "[s]uch other relief *** as the court may deem appropriate." 410 ILCS 305/13 (West 1998). The question then becomes: Does "such other relief" include punitive damages? We conclude that it does not. Punitive damages are warranted where an otherwise negligent act is accompanied by outrageous conduct or acts committed with malice or reckless indifference to the rights of others. *McCann v. Presswood*, 308 Ill. App. 3d 1068, 721 N.E.2d 811 (1999). Section 13 provides for liquidated damages of $1,000 for negligent violations and $5,000 where the violation is intentional or reckless. In other words, the statute specifically provides for increased damages where the disclosure is the result of conduct which typically warrants the imposition of punitive damages, but it does not provide for the imposition of punitive damages for such disclosures. Moreover, it is well-settled that punitive damages, because of their penal nature, are not favored is the law. *Ainsworth v. Century Supply Co.*, 295 Ill. App. 3d 644, 693 N.E.2d 510 (1998). We conclude that our legislature chose not to provide for the recovery of punitive damages for violation of the Act.

■ Finally, defendants argue that the amount of actual damages awarded was improper because it was based upon evidence obtained as the result of a serious discovery violation and opinion testimony from a witness unqualified to provide such testimony. Defendants also argue that the amount of actual damages was excessive and contrary to the manifest weight of the evidence.

With respect to the discovery violation, defendants contend that at no time during the discovery process did Doe reveal that she was being treated by Dr. Clay. Defendants maintain that because Doe was seeking to recover expenses related to her treatment for mental anguish, any information Dr. Clay had regarding Doe's emotional condition was relevant to the issue of damages.

In written interrogatories propounded to Doe, defendants asked her to state whether she had received any medical treatment from any physician or other health care provider for any medical, physical, or mental condition "referred to in any way in Plaintiff's First Amended Complaint," during the period "beginning ten years prior to the al-

leged improper disclosures, and continuing up to the present," and to state the name and address of each provider, the date and nature of each treatment or service, and the cost thereof. In response, Doe identified Dr. Paul L'Ecuyer, Judy Murashige, and Wal-Mart Pharmacy. At trial, Doe's attorney asked her whether she was "currently" being treated for depression and who her current treating doctors were. Doe responded that her physicians were Drs. L'Ecuyer and Clay.

Pursuant to Supreme Court Rule 213(i), a party has an ongoing duty to supplement or amend any prior answer or response to written interrogatories whenever new or additional information subsequently becomes known to that party. 177 Ill. 2d R. 213(i). Thus, Doe had an obligation to disclose the fact that she had begun treating with Dr. Clay and her failure to do so was technically a violation of Rule 213. We note, however, that Doe did not call Dr. Clay to testify at trial, nor did she seek to admit any evidence deposition or medical records of Dr. Clay. Furthermore, Doe did not seek reimbursement for any expenses related to Dr. Clay's treatment. Indeed, the *only* reference to Dr. Clay is Doe's testimony that she was currently treating with him. The standard for determining whether a trial court should grant a mistrial as a sanction for a discovery violation is whether the violation is of such character and magnitude as to deprive a party of a fair trial and the party seeking the mistrial demonstrates actual prejudice as a result. *Copeland v. Stebco Products Corp.*, 316 Ill. App. 3d 932, 738 N.E.2d 199 (2000). No evidence regarding Dr. Clay's diagnosis, treatment, or opinion was introduced at trial; defendants therefore could not have and did not suffer any prejudice as a result of Doe's failure to disclose the fact that she was being treated by Dr. Clay, and a new trial is not warranted.

Defendants also argue that the trial court erred in admitting the testimony of Judy Murashige, as an expert, into evidence. Defendants contend that Murashige was permitted to render opinion testimony that she was not qualified to provide. Specifically, defendants contend that art therapists are not qualified to diagnose or treat medical or mental conditions or to render an opinion to a reasonable degree of medical certainty, that Murashige was not a licensed art therapist, and that Murashige should not have been qualified as an expert because she did not utilize any objective standards but merely recited Doe's unsubstantiated statements.

Expert testimony is admissible if the proffered expert is qualified as an expert by knowledge, skill, expertise, training, or education and the testimony will assist the trier of fact in understanding the evidence. *Dotto v. Okan*, 269 Ill. App. 3d 808, 646 N.E.2d 1277 (1995). It is incumbent upon the party offering the witness to demonstrate

that the witness possess the necessary learning, knowledge, skill, or practical experience to enable such witness to testify as an expert. *Lombardo v. Reliance Elevator Co.*, 315 Ill. App. 3d 111, 733 N.E.2d 874 (2000). The determination of whether a witness is qualified to render an expert opinion and the decision to admit expert opinion testimony are matters that rest with the sound discretion of the trial court, and its ruling thereon will not be disturbed on appeal absent an abuse of discretion. *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 724 N.E.2d 115 (1999). An abuse of discretion occurs where the trial court acted arbitrarily and without the employment of conscientious judgment or, in view of all the surrounding circumstances, exceeded the bounds of reason and ignored recognized principles of law, such that substantial prejudice resulted. *May v. SmithKline Beecham Clinical Laboratories, Inc.*, 304 Ill. App. 3d 242, 710 N.E.2d 460 (1999).

Murashige testified that she was a registered art therapist. Murashige explained that to become a registered art therapist, a person was required to have a master's degree and complete a period of clinical experience under the supervision of a registered art therapist. Murashige testified that she had a bachelor's degree in secondary education and a master's degree in adult education. After working as an academic adviser and counselor, she subsequently enrolled in the art therapy program at Southern Illinois University at Edwardsville. Murashige stated that an art therapist was trained in all the psychological course work that a regular family therapist would have but also had an art background and was taught to use art as a diagnostic tool. Although she did not have a master's degree in art therapy, Murashige explained that she had completed all of the course work for a master's degree in art therapy and that, because she already had a master's degree, was not required to get a second master's degree in order to become an art therapist. She subsequently worked for two years under the supervision of a registered art therapist. Murashige explained that there was no exam or licensing requirement in order to become a registered art therapist. Prior to treating Doe, Murashige had spent the previous eight years working at an HIV resource center, counseling people with HIV.

Given Murashige's educational background and experience in counseling HIV patients, we cannot say that the trial court abused its discretion in admitting her testimony. Murashige had the required education and training to become a registered art therapist, and she had eight years' experience in counseling HIV patients. Murashige did not diagnose depression or any other psychological condition. She merely testified that she treated Doe for emotional problems related to Dr. Chand's disclosure of her HIV status and that Dr. Chand's

disclosures caused or contributed to the condition for which Murashige provided treatment.

■ Finally, defendants argue that the amount of actual damages was speculative and excessive because there was no objective evidence to support it. They request a new trial on actual damages. A trial court's determination on damages will not be disturbed on review unless that determination is contrary to the manifest weight of the evidence. *Lanterman v. Edwards*, 294 Ill. App. 3d 350, 689 N.E.2d 1221 (1998). Reviewing the record as a whole, we conclude that the trial court's award of actual damages was contrary to the manifest weight of the evidence.

As noted above, section 13 of the Act provides that a person may recover liquidated damages in the amount of $1,000 for negligent violations of the Act and $5,000 for intentional or reckless violations. Such amounts can be recovered without proof of damages. Our legislature further provided that a plaintiff could recover actual damages if such damages exceeded the amounts provided for in section 13. 410 ILCS 305/13 (West 1998). In the present case, the trial court found that Doe had proved numerous violations of the Act, but the court did not specify what these violations were, how many there were, or which violations were negligent and which were intentional or reckless. Moreover, Doe did not submit any evidence of or seek compensation for any medical bills, lost wages, or other out-of-pocket expenses. We conclude that the record simply does not support the finding that Doe's actual damages were $600,000.

For the foregoing reasons, the judgment of the circuit court of St. Clair County is affirmed with respect to its determination that Dr. Chand violated various provisions of the Act and with respect to the denial of defendant's motion for a jury trial. The award of punitive damages is reversed. The award of actual damages is vacated, and the cause remanded for a new trial on actual damages.

Affirmed in part, vacated in part, and reversed in part and cause remanded.

WELCH, J., concurs.

JUSTICE KUEHN, concurring in part and dissenting in part:

The legislature created the private right of action employed in this case for a serious reason. It wanted to promote voluntary testing for a deadly communicable disease. The legislature recognized that voluntary testing could lead to early discovery of infection and prevent that infection from being passed on to others by sexual activity known

to transmit the virus. This statute is primarily about protecting people and saving lives.

The legislature also recognized the social stigma that attaches to known carriers of the virus. Despite the limited means of contaminating others and the ability to live a relatively lengthy and normal existence before the virus progresses into AIDS, people known to carry human immunodeficiency virus (HIV) are pariahs, treated only slightly better than how people used to treat a leper who escaped from the colony. Hence, legislators provided an essential statutory promise to promote voluntary testing. Anyone who procures a test is assured that its results will remain a secret between the patient and his or her medical providers.

The paramount public policy that underlies the remedial cause of action successfully pursued in this case directs us to the true injury targeted for remediation. By allowing for recovery of actual damages in lieu of the statutorily fixed amount, our legislature sought to redress something more important than a medical bill or a lost wage, damages unlikely to flow from the disclosure of a medical test result. Actual damages were included to compensate for the mental anguish caused by particularly egregious breaches of the legislature's promise of confidentiality and to deter future breaches beyond the salutary effect that a mere $5,000 penalty could provide. This conclusion is obvious, given the manner in which the legislature provided for other remedies under the Act. The punitive element of the cause of action is illuminated in the heightened fixed damages for intentional, as opposed to negligent, violations of the Act's assurance.

The actual damages contemplated under this cause of action are akin to the highly subjective damages that people are allowed to recover for the intentional infliction of emotional distress. As the Illinois Supreme Court has recognized in refusing to allow punitive damages for that tort, its compensatory element is essentially punitive in nature. *Knierim v. Izzo*, 22 Ill. 2d 73, 88, 174 N.E.2d 157, 165 (1961). This is why punitive damages were not included in a statutory cause of action intended to provide a deterrent effect. By understanding the legislature's purpose, we can better focus on two key components of the actual damages in this case. The first is the emotional distress generated by public disclosure that Jane Doe harbored the capacity to infect people with a frightfully deadly, but misunderstood, disease. The second component measures the violator's conduct for the degree of its reprehensibility.

Because I did not observe Jane Doe's testimony, I feel uncomfortable trying to measure the depth of emotional distress that she suffered as a result of Dr. Chand's outrageous conduct. The trial judge

who observed her complaints was in a much better position to judge that. However, I am perfectly comfortable in measuring the outrageous nature of Dr. Chand's conduct for purposes of the punitive element of the actual damages that Judge O'Malley awarded. I cannot imagine a physician, schooled in the general confidentiality of medical treatment, engaging in such egregious conduct.

We do not need to know how many times Dr. Chand violated the Act. Once is enough, but here there were numerous violations. The ones we know about shock the senses. They speak plainly to a physician run amok, not only leaking highly guarded medical information, but actively engaged in an effort to ostracize her patient from other people. Moreover, she was doing so with false and defamatory information. Jane Doe did not have AIDS. She merely tested positive for the HIV virus, a condition that could lead to the deadly syndrome.

Submission of medical bills, wage losses, and the like should be of little import to our review of the damages awarded to Jane Doe. This case is all about betrayal—the betrayal of a patient and the betrayal of professional duty and trust. We need to pause and consider how a person could ever inflict a deeper wound than the one inflicted in this case. In effect, Dr. Chand, in violation of the Act, told family, friends, and fellow patients that Jane Doe was dying from a deadly disease. She also warned that being in her presence was a dangerous act. She suggested that Jane Doe should be completely avoided, as though AIDS could be contracted by airborne vapors. Dr. Chand actually pursued a course to effect isolation, labeling Jane Doe a social outcast. She had just as well condemned her patient to a leper colony.

Given the circumstances of this case, I am not prepared to find that the award of actual damages was against the manifest weight of the evidence. I concur in all other aspects of the majority opinion. While I agree that the legislature did not contemplate an award of punitive damages, I reiterate that it clearly intended the actual damages to contain a punitive element.