2018 IL App (1st) 150931

FIRST DISTRICT,
SECOND DIVISION
March 20, 2018

No. 1-15-0931

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 10 CR 17488-02 |
| | ) | |
| COREY ANDERSON, | ) | Honorable |
| | ) | Luciano Panici, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MASON delivered the judgment of the court, with opinion.
Justices Pucinski and Hyman concurred in the judgment and opinion.

**OPINION**

¶ 1     On May 12, 2010, Corey Anderson and several companions (including codefendants Jabriel Anderson, no relation to Corey, and Jason Burns) went looking for Tomaras Qualls to fight him. The group saw a silver Monte Carlo pull up nearby, and Jabriel said, "That was them." Burns fired several times at the Monte Carlo. Qualls was not in the car, but Adam Martinez, Brian Lawson, and Robert Alvarado were, and Martinez was fatally shot.

¶ 2     The State sought to hold Corey accountable for the shooting based upon allegations that (i) the gun used in the shooting belonged to Corey, (ii) Corey threatened Qualls's mother earlier that evening, and (iii) when Jabriel pointed out the Monte Carlo, Corey reached for his gun before Burns grabbed it and fired. Following a jury trial, Corey was found guilty on an accountability theory of the first degree murder of Martinez, the attempted murder of Lawson and Alvarado, and aggravated discharge of a firearm at Lawson and Alvarado. Corey was sentenced to 95 years' imprisonment.

¶ 3    On appeal, Corey argues that he was denied a fair trial because (i) the State failed to prove up its assertion that Corey threatened Qualls, upon which it relied heavily in its argument to the jury, and (ii) the State improperly used prior consistent statements to bolster the credibility of Marquell Carter, the only witness who testified that Corey had a gun. We agree and reverse and remand for a new trial.

¶ 4                                  BACKGROUND

¶ 5    On the evening of May 12, 2010, Xavier Smith was hosting a party at his home in Park Forest. Also present were Jabriel, Qualls, and Carter. Jabriel and Qualls got into an argument that escalated into a fistfight. Qualls left the party. He returned 10 to 15 minutes later with two friends and tried to convince Jabriel to come outside and fight them. Jabriel refused, whereupon Qualls and his friends left and did not return.

¶ 6    Jabriel made a phone call to his friend Raymond Darden, asking Darden to come pick him up. Later that evening, six individuals in two cars arrived, including Darden, who was accompanied by Corey (whose nickname was "Lord"), Burns, Cortez Robinson, Darden's girlfriend Latoya Kelly, and Burns's girlfriend Jasmine Johnson. The women stayed in the cars while the four men exited. Carter saw a gun in Corey's waistband. Jabriel ran outside to meet the group and told them about his earlier fight with Qualls. Then Jabriel, Corey, Burns, Darden, and Robinson walked to Qualls's house. At trial, Darden testified that he intended to mediate the conflict by talking to Qualls's brother, but in his earlier sworn testimony before the grand jury and at Burns's trial,[1] he stated that the group went to fight Qualls.

¶ 7    According to Darden, when the five of them reached Qualls's house, Jabriel knocked on the door, and Qualls's mother answered. Darden claimed not to remember the conversation that

_____

[1] The jury was not told that Darden was a witness at Burns's trial, merely that he testified in a "prior proceeding."

followed. The State attempted to impeach him with his prior sworn testimony before the grand jury and at Burns's trial. Darden admitted stating before the grand jury that Jabriel said, "Tell your son I am going to f*** him up." The State then tried to elicit testimony about what Corey said:

> "Q. Do you recall being asked this question on cross examination [during Burns's trial] and giving this answer: Question: 'When they were in front of the door, Lord [Corey] said to B.D. [Jabriel], quote, Get out of the way. I am going to fan their ass.' Answer: 'Yes.'
>
> Do you remember being asked that question at the prior testimony on June 20th of 2012?
>
> A. Yes."

On cross-examination, the defense also asked Darden about what Corey said:

> "Q. Now, you testified that although you don't recall, in that prior proceeding in 2012 and at the police station, you said something to the effect about Corey stating he was going to fan their ass or something to that effect, do you remember that?
>
> A. I don't recall."

¶ 8    After their confrontation with Qualls's mother, the five men left and walked back to Smith's house. As they neared Smith's house, a silver Monte Carlo drove past them and parked. Carter, standing in the doorway of Smith's house, heard someone say "That's the people? Is that them?" Carter saw Corey reach toward the gun in his waistband, but Burns snatched the gun from him and fired at the Monte Carlo.

¶ 9     Three days after the shooting, on May 15, 2010, Carter went to the Park Forest Police Department and identified Corey and Burns in photo arrays. On direct examination, the prosecutor presented Carter with the photo arrays and asked:

> "Q. Did you make a notation, did you actually physically write something next to the photograph of Jason Burns?
>
> A. Yes.
>
> Q. And what did you write?
>
> A. 'This is the person I saw get the gun from Lord and shot at the Monte Carlo.' "

The prosecutor then showed Carter the photo array in which he identified Corey and asked:

> "Q. And can you tell the jury, what did you write on this photo array?
>
> A. 'This is the person I know as Lord. He told me his name was Lord. I saw a gun in his waistband. The other guy took the gun from Lord and shot at the Monte Carlo.' "

The State displayed the photo arrays with Carter's annotations on a video screen for the jury to view, and Carter reconfirmed his handwritten statements about Corey and Burns.

¶ 10     On cross-examination, Carter admitted that on the day of the shooting, he was smoking marijuana, drinking, and taking ecstasy. The day after the shooting, Carter met with detectives and told them, falsely, that he did not know any of the people who came to reinforce Jabriel. Carter told the detectives that he saw a person with short hair shooting at the Monte Carlo (*i.e.*, Burns), but he did not tell them that Corey had a gun. The next day, May 14, Carter returned to the police station and said that he knew Darden and Robinson and that he saw a gun in Corey's waistband.

¶ 11     Carter appeared before the grand jury on May 17, but he asserted his fifth amendment right not to testify because he was on juvenile probation, and smoking and drinking violated the

terms of his probation. On June 9, Carter appeared before the grand jury again and testified in exchange for immunity from prosecution for the probation violation.

¶ 12        Darden also testified about the shooting but claimed not to remember many of the details of what occurred. He was impeached with his prior sworn testimony, in which he said that when the Monte Carlo drove past, Jabriel said "That was them" and "Give me the cappa, give me the cappa" (*i.e.*, the gun). Around the same time, Darden saw Corey tugging at the waistband of his pants "as if he did have a pistol." At trial, Darden testified that he never actually saw Corey with a gun.

¶ 13        The Monte Carlo parked in the lot directly behind Smith's house. The group headed toward the car: Darden and Corey went around the right side of the house, while Jabriel, Burns, and Robinson took a more direct route through a gangway. Corey then reversed direction and went through the gangway with the others. Darden heard several gunshots and ran back to his car. The others came running back as well, and they got back in their vehicles and drove away. During the drive, Jabriel told Darden that Corey and Burns "let them n***** have it."

¶ 14        Jasmine testified that, as they drove away, she saw the black handle of a gun protruding from Burns's waistband. A few days after the shooting, Jasmine and Burns went to Corey's house, and Burns handed the same gun to Corey. On cross-examination, Jasmine stated that she saw Burns with that gun on one occasion prior to the shooting, when Burns put it under his mattress in his house.

¶ 15        Qualls was not in the silver Monte Carlo on the night of the shooting. Instead, the occupants were a group of friends who were not involved in the earlier fight between Jabriel and Qualls. Martinez was driving, Lawson was in the front passenger seat, and Alvarado and Andre Johnson were in the back. They were planning to go to Martinez's girlfriend's house, but first,

they were planning to purchase marijuana from a friend in Park Forest. After Martinez parked the car, Alvarado noticed a group of individuals staring at them. "Who that?" he said. Lawson said, "I don't know who that is. Let's get out of here." Martinez put the car into reverse. Immediately, gunshots rang out, shattering the passenger-side window. Lawson crouched down with his head between his knees. He shook Martinez's leg, saying, "Why aren't we moving? Why are we still here?" Martinez did not respond. Lawson looked up and saw Martinez bleeding profusely from a wound in the side of his head.

¶ 16    Lawson, Alvarado, and Andre fled the car on foot. Lawson ran to a nearby house and asked the people inside to call the police. Police and paramedics responded to the scene, and Martinez was brought to the hospital, where he died. An autopsy revealed that the cause of death was a gunshot wound to the head.

¶ 17    After the State rested, the defense moved for a directed verdict, which the trial court denied. The defense then stated:

"DEFENSE COUNSEL: Judge, I just have one thing to address before. The State has failed to perfect the impeachment as to the statement of Raymond Darden about Corey allegedly saying 'I'm going to fan their ass.' It was neither in the stipulation for the prior proceeding nor did they play the video where that was. It's not in the grand jury transcript. It was never perfected.

THE COURT: He admitted to it.

DEFENSE COUNSEL: Okay.

THE COURT: That's why they didn't play it, because he admitted it."

¶ 18    During closing arguments, the prosecutor emphasized Corey's culpability in "bring[ing] a gun to a fistfight," reminding the jury that Corey allegedly threatened to "fan their ass" and

saying: "[T]hat statement in and of itself is evidence that this defendant did have the firearm in his waistband. Tough Guy wants to go up to somebody's home that he doesn't know who these people are, and he wants to fan their ass." The prosecutor also argued that Corey's threat "just tells his participation. It just tells letting everyone know I brought a gun to a fistfight. It's right here if anyone needs it, and I'm prepared to use it. That is what makes him legally accountable under our laws."

¶ 19    The jury found Corey guilty of the first degree murder of Martinez, the attempted murder of Lawson and Alvarado, and aggravated discharge of a firearm at Lawson and Alvarado.[2] Corey, whom the trial court permitted to represent himself at sentencing, was sentenced to 45 years' incarceration for first degree murder and 25 years for each of the attempted murders of Lawson and Alvarado, imposed consecutively for a total of 95 years.

¶ 20                                    ANALYSIS

¶ 21    Corey argues that his conviction must be reversed because (i) the State failed to prove up its assertion that he threatened Qualls's mother and (ii) the State improperly bolstered Carter's credibility with his prior consistent statements regarding Corey's possession of a gun. We consider these contentions in turn.

¶ 22                          Corey's Alleged Threat

¶ 23    In establishing Corey's accomplice liability, one of the State's key assertions was that when Corey and his companions went to Qualls's house and confronted his mother, Corey threatened to "fan their ass." Corey argues that the State failed to present evidence to substantiate this assertion, thereby denying him a fair trial. Corey also argues that the State exacerbated this

_____

[2] Although Corey was also charged with aggravated discharge of a weapon and the attempted murder of Andre, the Monte Carlo's fourth occupant, the State evidently elected not to proceed on those charges, as they were not presented to the jury.

error by falsely asserting in closing argument that Darden reported Corey's threat to the grand jury and to police, neither of which is supported by the record.

¶ 24    The right to a fair trial includes the right to a verdict based solely on the evidence actually introduced at trial. *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965); see also *Jordan v. Hepp*, 831 F.3d 837, 846 (7th Cir. 2016) ("a prosecutor may not urge a jury to base its decision on information known to the prosecutor but not presented at trial"). This requirement "goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner*, 379 U.S. at 472. Thus, it is improper for the State to ask a witness questions that presume facts not in evidence unless the State later substantiates those facts. *People v. Williams*, 333 Ill. App. 3d 204, 211 (2002). In particular, if a party attempts to impeach a witness with a prior inconsistent statement and the witness denies making the statement, claims that he cannot remember making it, or otherwise equivocates, "then it is incumbent on the examining party to offer evidence of the statement." *People v. Evans*, 2016 IL App (3d) 140120, ¶ 33.

¶ 25    After Darden testified that he did not recall whether Corey said anything to Qualls's mother, the prosecutor attempted to impeach him with his prior sworn testimony at Burns's trial:

"Q. Do you recall being asked this question on cross examination and giving this answer: Question: 'When they were in front of the door, Lord [Corey] said to B.D. [Jabriel], quote, Get out of the way. I am going to fan their ass.' Answer: 'Yes.'

Do you remember being asked that question at the prior testimony on June 20th of 2012?

A. Yes."

A plain reading of this testimony reflects that Darden admitted being *asked* a question about Corey's statement but he did not admit what, if anything, he *answered*. This is consistent with

his testimony on cross-examination, when he claimed not to remember this testimony. Thus, it was incumbent on the State to present evidence of Darden's answer (*Evans*, 2016 IL App (3d) 140120, ¶ 33; *Williams*, 333 Ill. App. 3d at 211)—which the State never did.

¶ 26 The State argues that requiring it to provide evidence of Darden's testimony at Burns's trial is "unduly formalistic" and relies on a "hyper-technical reading of the record." We disagree. It requires no undue formalism to give effect to the plain meaning of Darden's testimony—*i.e.*, that he did not admit making a prior statement as to what Corey may have said at Qualls's house. Moreover, this error did not go unnoticed by the parties: after the State rested, the defense raised an objection to the State's failure to perfect the impeachment of Darden on this point, but was overruled by the trial court. The trial court's ruling that Darden admitted the testimony at issue was unsupported by the record and was therefore an abuse of discretion. *Doe v. Chand*, 335 Ill. App. 3d 809, 814 (2002) (trial court abuses its discretion when its factual determination is unsupported by the record).

¶ 27 The State additionally compounded its error by stating in closing argument:

"[W]hat does Raymond Darden, his friend, *admit to the police, to the grand jury of Cook County*, and under oath at a prior proceeding? That at that point when Jabriel says to [Qualls's] mother 'I'm going to f*** your son up,' [Corey] starts reaching in his waistband area, that would be the waistband where he had the gun that Marquell Carter saw, and said to [Jabriel], 'Get out of the way. I'm going to fan their asses.' " (Emphasis added.)

Here, the State not only emphasized its unproven assertions regarding Corey's threat, but it gratuitously added to them by claiming that Darden spoke about the alleged threat to the grand

jury and to the police. In fact, Darden never testified to the grand jury about Corey's alleged threat, nor was there any evidence at trial that he spoke about it to police.

¶ 28    Thus, the State's argument was clearly in error. See *People v. Jackson*, 2012 IL App (1st) 102035, ¶¶ 16-20 (reversing conviction where the prosecutor misstated the evidence to the jury in closing argument). Under the circumstances, the State's error substantially prejudiced Corey by magnifying the State's unproven allegations about Corey's threat. The potential for prejudice is particularly high because Darden testified on three different occasions—at Corey's trial, at Burns's trial, and before the grand jury—and the details to which he testified were different on each occasion. A reasonable juror might remember the substance of Darden's testimony but be uncertain as to what exactly he said on which occasions. Such a juror might therefore be influenced by the State's forceful and uncontradicted assertion that Darden admitted to Corey's threat on three separate occasions.

¶ 29    The State argues that Corey has forfeited these issues because he failed to object to the State's closing argument and failed to argue in his posttrial motion that the State failed to prove up its assertions regarding Corey's threat. *People v. Thompson*, 238 Ill. 2d 598, 611-12 (2010). Corey acknowledges his forfeiture, but he argues that we may still review this issue as plain error because the evidence of Corey's intent to facilitate the shooting was closely balanced and because the State's use of evidence outside the record implicates a fundamental aspect of the right to a jury trial. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007) (plain error doctrine allows review of unpreserved errors when either the evidence is so closely balanced that the error threatened to tip the scales against the defendant or the error "is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process"). Corey additionally argues that his trial counsel was ineffective for failing to preserve these issues for

appellate review. *People v. Patterson*, 2014 IL 115102, ¶ 81 (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984)).

¶ 30    We find that the closely balanced prong of the plain error doctrine has been satisfied. In order to prove Corey guilty on a theory of accountability, the State was required to show that Corey had "the intent to promote or facilitate" Burns's criminal actions. 720 ILCS 5/5-2(c) (West 2010) (definition of legal accountability). The State's evidence was not strong. Carter was the only witness who claimed to see Corey with a gun, and his credibility was attacked on multiple grounds: (i) he admitted smoking marijuana, drinking, and taking ecstasy on the day of the shooting, in violation of his juvenile probation; (ii) at the time of trial, Carter had a pending criminal charge for aggravated unlawful use of a weapon and was under house arrest; and (iii) the day after the shooting, when questioned by detectives, Carter falsely stated that he did not know any of the people accompanying Jabriel. It was only later that Carter changed his story and told police that Corey had a gun, and even then, Carter refused to testify before the grand jury until he was given immunity from prosecution.

¶ 31    Additionally, Carter's testimony was contradicted by Darden, who denied seeing Corey with a gun on the day of the shooting. Jasmine's testimony as it related to ownership of the gun was conflicting; although she testified that Burns gave the gun to Corey a few days after the shooting, she also testified to seeing the gun in Burns's possession prior to the shooting, when he put the gun under his mattress in his house.

¶ 32    Thus, the State's allegations regarding Corey's threat were central to establish both that Corey had a gun on the day of the shooting and that he was willing to use it. This is underscored by the State's closing argument, in which the prosecutor asserted that Corey's threat "in and of itself is evidence that this defendant did have the firearm in his waistband. Tough Guy wants to

go up to somebody's home that he doesn't know who these people are, and he wants to fan their ass." The prosecutor also argued that Corey's threat established his guilt as an accomplice, stating: "It just tells his participation. It just tells letting everyone know I brought a gun to a fistfight. It's right here if anyone needs it, and I'm prepared to use it. *That is what makes him legally accountable under our laws.*" (Emphasis added.)

¶ 33    The State argues that Corey's willing participation was also established by the fact that he reached for his gun before Burns snatched it and fired. But Carter is the only one who testified to this version of events, and as discussed, Carter's credibility was attacked at trial. Although Darden in his prior testimony stated that he saw Corey tugging at the waistband of his pants, Darden recanted that testimony at trial. Darden also agreed with defense counsel that Corey was wearing "the pants like all the young guys wear" that "sometimes have a hard time staying up."

¶ 34    In light of the conflicting evidence regarding Corey's role in the shooting, as well as the credibility issues regarding the State's key witness, it would not have been irrational for the jury to conclude that the State failed to prove Corey's intent to assist Burns. Accordingly, there was a substantial probability that the State's heavy reliance on Corey's alleged-but-unproven threat influenced the jury's guilty verdict.

¶ 35                              Carter's Statements to Police

¶ 36    Corey additionally contends that the State improperly bolstered Carter's credibility by introducing his prior consistent statements made to police three days after the shooting. Specifically, Carter identified Burns in a photo array and wrote next to his picture, "This is the person I saw get the gun from Lord and shot [*sic*] at the Monte Carlo." He also identified Corey in a photo array and wrote, "This is the person I know as Lord. He told me his name was Lord. I saw a gun in his waistband. The other guy took the gun from Lord and shot at the Monte Carlo."

Carter's handwritten statements on the photo arrays were displayed to the jury during Carter's testimony and again during the State's closing argument. The State contends that these statements were properly admitted as prior identifications under section 115-12 of the Code of Criminal Procedure (725 ILCS 5/115-12 (West 2012)). Although we have already concluded that Corey is entitled to a new trial, we address this issue because it is likely to recur on remand.

¶ 37        Generally, a party may not bolster the credibility of its own witness on direct examination by introducing his prior consistent statements. *People v. Dupree*, 2014 IL App (1st) 111872, ¶ 42. "The danger in prior consistent statements is that a jury is likely to attach disproportionate significance to them. People tend to believe that which is repeated most often, regardless of its intrinsic merit, and repetition lends credibility to testimony that it might not otherwise deserve." (Internal quotation marks omitted.) *People v. Johnson*, 2012 IL App (1st) 091730, ¶ 60. But it is well established that "this rule does not apply to statements of identification." *People v. Temple*, 2014 IL App (1st) 111653, ¶ 34. Under section 115-12 of the Code of Criminal Procedure, "[a] statement is not rendered inadmissible by the hearsay rule if (a) the declarant testifies at the trial or hearing, and (b) the declarant is subject to cross-examination concerning the statement, and (c) the statement is one of identification of a person made after perceiving him." 725 ILCS 5/115-12 (West 2012). Such statements are admissible as substantive evidence. *People v. Williams*, 193 Ill. 2d 306, 359 (2000).

¶ 38        The parties do not dispute that the first two elements of section 115-12 are met: Carter testified at Corey's trial and was subject to cross-examination concerning his statements to police. The issue is whether Carter's statements to police constitute statements of identification. Our supreme court has defined "statements of identification" broadly to encompass "the entire identification process." *People v. Tisdel*, 201 Ill. 2d 210, 219 (2002) (trial court properly

permitted evidence of witnesses' nonidentification of perpetrator in prior lineups composed of individuals with features similar to defendant's). Nevertheless, section 115-12 does "not allow the admission of every discussion between a [witness] and a police officer, only those pertaining to identification of a person made after perceiving him." *People v. Newbill*, 374 Ill. App. 3d 847, 853 (2007).

¶ 39    The parties do not cite, nor has our research disclosed, any Illinois cases explicitly addressing the extent to which the prior identification exception encompasses the declarant's statements regarding what he observed the identified person doing. We find the following discussion by the Texas Court of Appeals to be persuasive:

> "The Illinois Supreme Court, in construing a statutory exclusion to the hearsay rule substantively identical to Federal Rule 801(d)(1)(C) and Texas Rule 801(e)(1)(C), rejected an interpretation that would limit admissible testimony under the statute solely to the 'actual identification' of a person, reasoning instead that 'construing "statements of identification" to include the entire identification process would ensure that a trier of fact is fully informed concerning the reliability of a witness' identification, as well as the suggestiveness or lack thereof in that identification.' [Citations.] Similarly, the District of Columbia Court of Appeals has held, under its substantively identical exception, that although 'detailed accounts of the actual crime' are not admissible, the declarant's 'description of the offense itself is admissible under this exception only to the extent necessary to make the identification understandable to the jury.' " *Delacerda v. State*, 425 S.W.3d 367, 390-91 (Tex. Ct. App. 2011) (quoting *Tisdel*, 201 Ill. 2d at 219 and *Brown v. United States*, 840 A.2d 82, 89 (D.C. 2004)).

See also *Porter v. United States*, 826 A.2d 398, 410 (D.C. 2003) ("Some limited reference in the identification to the criminal act is permissible."); *Johnson v. United States*, 820 A.2d 551, 559 n. 4 (D.C. 2003) ("To be understandable and therefore probative, an identification must have context, and the circumstances of Heard's identification which the jury learned about from his prior statement were relevant to the identification.")

¶ 40    Both *Delacerda* and *Brown* examined how much context is admissible under the prior identification exception. *Delacerda* was a murder case that arose out of a drive-by shooting from a pickup truck. *Delacerda*, 425 S.W.3d at 374. Cruz testified for the State that he was lying in the back of the truck and that defendant, a passenger in the cab of the truck, was the shooter. *Id.* at 376. An officer testified, over defense objection, that one of the victims identified Cruz in a photospread as the one he saw lying in the back of the truck. *Id.* at 391-92. The Texas Court of Appeals found that this testimony was admissible as a prior identification—not just the victim's identification of Cruz but also what he saw Cruz doing (lying in the back of the truck). The court explained:

> "We agree with the rationale of the Illinois Supreme Court and the District of Columbia Court of Appeals that limiting admissible testimony under the identification exclusion to the hearsay rule solely to the declarant's naming of the identified individual and not allowing testimony regarding what the declarant identified the individual as doing is unduly restrictive." *Id.* at 392-93 (citing *Tisdel*, 201 Ill. 2d 210).

¶ 41    *Brown*, 840 A.2d 82, is also instructive. Brown was charged with multiple counts of child sexual abuse. An officer testified that one of the victims, S.T., came to the police station and identified Brown as having beaten and sexually abused her. The D.C. Court of Appeals held that, under the prior identification exception, "[t]he trial court correctly ruled that the officer could

provide a summary of S.T.'s statements, but not any unnecessary details." *Id.* at 89. More questionable was the trial court's admission of detailed out-of-court statements by another victim, who discussed when the abuse began, how often it occurred, and the locations where it occurred. *Id.* at 90. The D.C. Court of Appeals stated that these details arguably went beyond those necessary to make the identification understandable, but it ultimately found that another hearsay exception applied (the medical diagnosis exception). *Id.*

¶ 42　　　　In agreement with *Delacerda* and *Brown*, we hold that, when admitting a prior identification as substantive evidence under section 115-12, the testimony may include a description of the offense "only to the extent necessary to make the identification understandable to the jury," but it may not go beyond that to provide "detailed accounts of the actual crime." (Internal quotation marks omitted.) *Id.* at 89. This is in keeping with how Illinois courts have interpreted the prior identification exception. For instance, in *People v. Tayborn*, 254 Ill. App. 3d 381 (1993), defendant was charged with attempted murder in connection with a shooting at Murchinson's home. At trial, an officer testified that when he interviewed Murchinson the day after the shooting, "Murchinson identified defendant as one of the men who carried a Tech-9 automatic weapon and shot into Murchinson's home." *Id.* at 390. We held that Murchinson's out-of-court statement was properly admitted as a statement of identification under section 15-112. *Id.*; see also *Temple*, 2014 IL App (1st) 111653, ¶ 41 (in prosecution for drive-by shooting, witnesses' prior consistent statements identifying the defendant as the shooter and describing the car in which defendant was riding were admissible under section 115-12).

¶ 43　　　　Under this standard, Carter's verbal testimony regarding his prior identifications of Corey and Burns was properly admitted. In a police interview three days after the shooting, Carter identified Corey as the person who was carrying a gun and Burns as the person who took the gun

from Corey and shot at the Monte Carlo—*i.e.*, the minimum detail necessary to make the identifications intelligible to the jury. Indeed, Carter's identifications closely parallel the identification admitted in *Tayborn*, except that in *Tayborn*, defendant both carried and fired a gun, whereas in this case, Corey carried the gun and Burns fired it.

¶ 44　　　　Corey nevertheless argues that this case is analogous to *People v. Randolph*, 2014 IL App (1st) 113624, and *People v. McWhite*, 399 Ill. App. 3d 637 (2010), both of which held a witness's prior consistent statements inadmissible. Both cases are distinguishable, since neither of them dealt with the admissibility of a prior identification under section 115-12.

¶ 45　　　　In Randolph's trial for possession of cocaine, the State elicited testimony regarding the arresting officers' police report. *Randolph*, 2014 IL App (1st) 113624, ¶ 5. According to the report, the officers were patrolling a "high narcotic area" when Randolph saw the officers, immediately crossed the street, and dropped an object. One of the officers recovered the object, which was found to contain cocaine. We held that introducing the report as substantive evidence was reversible error. *Id.* ¶ 18. But the State did not argue that the report was admissible as a prior identification. Moreover, even if the State had done so, the report went beyond the level of detail necessary to make the identification understandable to the jury. The officers could properly have testified that, in their report, they identified Randolph as the person who dropped the object that the officers recovered. But the additional information in the report—the fact that defendant was in a "high narcotic area" and crossed the street as soon as he saw the officers—was not necessary as context for the identification and was therefore not permissible under section 115-12.

¶ 46　　　　*McWhite*, another narcotics case, is similarly inapposite. At trial, the State introduced evidence of an officer's prior consistent statements at a preliminary hearing and in multiple arrest reports. *McWhite*, 399 Ill. App. 3d at 640. According to the officer's statements, the officer saw a

barbeque grill at the base of a tree in a vacant lot. Defendant opened the grill, removed a cigarette box, and retrieved suspected drugs from the box. *McWhite* held that the trial court abused its discretion in allowing these prior consistent statements as substantive evidence. *Id.* at 642. But, as in *Randolph*, the State did not argue that the complained-of statements were admissible under section 115-12, and in any case, the officer's prior statements contained more detail than necessary to make his identification of defendant understandable to the finder of fact.

¶ 47     Accordingly, we hold that the trial court properly allowed Carter to testify that, three days after the shooting, he identified Corey to police as the one who was carrying a gun and Burns as the one who took the gun from Corey and fired.

¶ 48     Corey additionally argues that, even if Carter could properly testify regarding what he said to police, it was improper for the State to display Carter's handwritten statements on the photo arrays because doing so served to unfairly emphasize those statements. We agree. As discussed, under the prior identification exception, the witness's description of the offense is limited to that which is necessary "to make the identification understandable to the jury." (Internal quotation marks omitted.) *Brown*, 840 A. 2d at 89. Carter's verbal testimony was sufficient for that purpose. The fact that Carter wrote the statements on the photo array was irrelevant to their admissibility, but the fact that Carter wrote the statements down was used by the State to bolster their trustworthiness. Displaying Carter's handwritten statements did not provide any further necessary context for the jury and, therefore, did not enhance the jury's understanding of the identification. The only purpose it served was to reiterate Carter's statements—once when the State put the photo arrays on a video screen for the jury to see, a second time when the State asked Carter to confirm that he wrote the statements displayed on the screen, and a third time during the State's closing argument when the State displayed the photo

arrays again. In doing so, the State unnecessarily and improperly emphasized Carter's written out-of-court statements in the eyes of the jury. As this court has previously observed, "[p]eople tend to believe that which is repeated most often, regardless of its intrinsic merit." (Internal quotation marks omitted.) *Johnson*, 2012 IL App (1st) 091730, ¶ 60.

¶ 49     The State's use of Carter's out-of-court statements essentially as a demonstrative exhibit was particularly prejudicial due to the closeness of the evidence. As discussed, Carter was the only witness who claimed that Corey had a gun; Darden testified that he did not see Corey with a gun on the day of the shooting. But the State arguably elevated Carter's testimony over Darden's by repeatedly displaying Carter's handwritten statements—and, in doing so, may have impermissibly affected the outcome of the trial. Thus, on remand, although the State may present testimony as to Carter's identification of Burns and Corey three days after the shooting, we hold that Carter's handwritten statements on the photo arrays may not be shown to the jury.

¶ 50     Finally, although we find that Corey is entitled to a new trial, we comment briefly on an error the State concedes occurred after trial. During proceedings on posttrial motions, Corey informed the court that he was "looking into hiring new counsel." On the next court date, Corey presented a *pro se* motion alleging ineffective assistance of counsel, stating that he no longer wanted to be represented by his trial counsel but "wasn't able to retain" alternative counsel. The trial court then allowed him to proceed *pro se*. This was erroneous for two reasons. First, Corey did not unequivocally request to proceed *pro se*; on the contrary, the record reflects that he wanted a lawyer but was unable to retain one. Second, the trial court did not admonish Corey pursuant to Illinois Supreme Court Rule 401(a) (eff. July 1, 1984)—which, notably, requires the court to inform the defendant "that he has a right to counsel and, if he is indigent, to have counsel appointed for him by the court." See *People v. Jiles*, 364 Ill. App. 3d 320, 329 (2006)

(compliance with Rule 401(a) is required at the time a defendant chooses to waive counsel). Thus, there was no valid posttrial waiver of counsel.

¶ 51                                  CONCLUSION

¶ 52        The State's use of unsubstantiated assertions regarding Corey's alleged threat to Qualls's mother deprived Corey of a fair trial and constituted plain error in light of the closeness of the evidence. The State also improperly bolstered Carter's otherwise admissible statements of identification by repeatedly showing the jury the photo arrays on which Carter had written those statements. We therefore reverse Corey's convictions and remand for a new trial.

¶ 53        Reversed and remanded.